Doyle E. RAFTIS, Appellant,

v.

UNITED STATES of America, Appellee.

Vernon F. HAWKINS, Appellant,

v.

UNITED STATES of America, Appellee.

Curt MARTIN, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 18040, 18044, 18084.

United States Court of Appeals Eighth Circuit.

Aug. 24, 1966.

Henry G. Morris, St. Louis, Mo., for appellants in 18040 and 18044.

Robert H. Kubie, Asst. U. S. Atty., St. Louis, Mo., for appellee; Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., on the brief.

Before JOHNSEN and BLACKMUN, Circuit Judges, and YOUNG, District Judge.

BLACKMUN, Circuit Judge.

Doyle E. Raftis, Vernon F. Hawkins and Curt Martin have been convicted by a jury of violations of the mail fraud statute, 18 U.S.C. § 1341. They appeal.

The alleged scheme centered in Pac Aid of Missouri, an unincorporated Saint Louis enterprise which was engaged in the sale of coin operated aspirin vending machines and of tins of Bayer's aspirin dispensed from those machines. Initial customer contacts were made through newspaper ads. Personal solicitation and mail communication followed. A machine with an initial supply of about 20 tins of aspirin sold for $80. Most buyers took on from 10 to 20 machines. The machine dispensed the aspirin at 25¢ a tin. Apart from the initial supply, the owner purchased aspirin from Pac Aid at 11¢. He paid 5¢ to the proprietor at the machine's location, usually a restaurant, motel, bowling alley, or gas station. The remaining 9¢, less the cost of servicing, was profit.

The indictment contained 24 counts. It named as defendants the three appellants and four others. It also listed the

names of 148 persons who allegedly had been defrauded during the period from about November 11, 1960, to about July 27, 1962. Generally, it charged Raftis as the operator of the business, Martin as office manager and salesman, and the others as salesmen. It alleged, as parts of the scheme and artifice to defraud, purported sponsorship of the Pac Aid operation by Sterling Drug, Inc., manufacturer of Bayer's aspirin; ascertainment of a prospect's available cash; obtaining of cash or check from the prospect prior to delivery of the merchandise; immediate certification of any check so received; the defendants' making themselves unavailable to the buyer after his purchase; and the making of false representations as to Pac Aid's having exclusive distribution rights from Sterling to sell Bayer's aspirin through vending machines and being subject to contract cancellation by Sterling, as to Pac Aid's having surveyed, through trained location engineers, the buyer's territory and selected and arranged for the best locations for the machines, as to assistance in the installation of machines, as to profit to Pac Aid in the sale of aspirin rather than of machines, as to weekly profits to be expected from a unit, as to Pac Aid's selling the route if the buyer becomes dissatisfied, as to the trouble-free character of the machine and free repairs and replacements, and as to periodic supervision and visitation by Pac Aid. The 24 counts then relate to specific mail deposits or receipts for the purpose of effecting the scheme. There was no conspiracy count.

At the close of its case, and with leave of court, the prosecution dismissed five of the counts.

The jury convicted Raftis and Martin on all 19 remaining counts and Hawkins on the 18 counts which were submitted to the jury as to him. It acquitted the other four defendants. The court sentenced Raftis to three years on each of nine counts, to be served concurrently, and two years on each of the other ten counts, to be served concurrently but consecutively with the three year sentences, thus making a total of five years; the two year sentences, however, were all made subject to the provisions of 18 U.S.C. § 4208(a). The sentences imposed on Hawkins were on a similar three and two year pattern but he was placed on probation to begin at the end of the three year sentences. Martin received sentences similar to those imposed on Hawkins but on a two and two year basis.

The respective appellants raise five points; they attack (1) the sufficiency of the evidence; (2) the denial of defense motions to quash a subpoena, to suppress evidence, and to quash the indictment; (3) the verdict forms submitted to the jury; (4) the exclusion of Raftis' Exhibit S; and (5) the refusal of a position instruction proffered by Hawkins.

■ Initial reference should be made to Martin's appellate posture. This defendant was represented throughout the trial by separate retained counsel. His attorneys filed a notice of appeal on his behalf. The transcript was thereafter prepared and filed. Henry G. Morris, as appellate counsel for Hawkins and Raftis, filed a separate brief for each of them. Mr. Morris had not been trial counsel for either Hawkins or Raftis but had represented one of the defendants who was acquitted. No brief was timely filed on Martin's behalf. No explanation as to this was forthcoming and he made no application for additional time. The government moved to dismiss Martin's appeal for failure to prosecute. Martin then presented himself personally and filed with us a writing which recites that he did not have a lawyer and could not pay for one but

"I would like to request of the Court of Appeals that I be allowed to participate in briefs filed by Raftis #18040 and also Hawkins #18044. I have read both briefs and understand them and all the points made in them. If the court will grant my request I will abide by the court's decision in the matter."

Mr. Morris, being aware of Martin's request, consented to have his two briefs

serve for Martin, too. We, accordingly, deny the government's motion to dismiss.

Wholly apart from Martin's gesture, the voluntariness of which is not questionable, we are aware of the desirability of having appellate counsel for a defendant on his direct appeal from a conviction of a federal crime. We have read the record with Martin's status in mind. We are fully satisfied that Mr. Morris' briefs, particularly the one for Raftis, have application and pertinency for Martin; that they embrace and appropriately present all arguments on his behalf; that Martin's and Raftis' postures here are essentially identical; and that all requirements of appropriate federal appellate representation for Martin have been adequately satisfied. We are grateful to Mr. Morris for his cooperation in this respect.

1. The sufficiency of the evidence. On a number of occasions this court has observed that it is unnecessary and of little profit to relate in full detail what the government establishes in these voluminous-record mail fraud cases. See Friedman v. United States, 347 F.2d 697, 706 (8 Cir. 1965), cert. denied 382 U.S. 946, 86 S.Ct. 407, 15 L.Ed.2d 354; Koolish v. United States, 340 F.2d 513, 519 (8 Cir. 1965), cert. denied 381 U.S. 951, 85 S.Ct. 1805, 14 L.Ed.2d 724; Slocum v. United States, 325 F.2d 465, 468 (8 Cir. 1963). We again are content with a general outline of the proof.

We start, of course, with the customary observation that we are to view the evidence in the light most favorable toward sustaining the verdict and that all reasonable inferences are to be resolved in favor of the government. Friedman v. United States, supra, p. 706 of 347 F.2d; Fabian v. United States, 358 F.2d 187, 195 (8 Cir. 1966).

The record indicates that Raftis was the primary force behind the enterprise. He was the one who, in November 1960 with counsel's advice, registered under the Missouri fictitious names statutes, V.A.M.S. §§ 417.200–417.230, to engage in business under the name of Pac Aid of Missouri.

Raftis, however, did not take the stand. The two other appellant-defendants did and some of that government's case is buttressed by what they said as witnesses.

Hawkins testified that he was associated with Pac Aid from eighteen months to two years; that he sold machines and aspirin; that he called on prospects; that he used brochures which related to Bayer's aspirin and the demand for the product; that he introduced himself as Marvin Millar; that a prospect would be asked how many aspirins a day could be sold out of a vending machine; that he would start with the prospect's figure but would lower it; that he had occasion to go out with Raftis on calls; that an application blank was taken from the customer which required information concerning financial worth and business experience; that the purchase order was subject to the company's acceptance; that he did not know whether the company ever checked this information; that he told prospects "there would be a certain amount of training in the business of some nature"; that he told them that the machines would be placed by Pac Aid's location men; that he himself did not know how to load the machines and had never loaded any; that there was never a survey of a community prior to the sale of machines; that he showed one of the count witnesses some checks from Sterling; that when he received a purchase order he also took a deposit; that when a check was taken it contained authority for certification or the issuance of a cashier's check in its place; that it was his duty to go directly to the bank and have the check certified; that Pac Aid did not have a resale department even though its operation's manual referred to one; that he told customers the machines were guaranteed; and that he was the first salesman Pac Aid had and trained one or two others.

Martin testified that his name was Robert Burns; that he used the name Martin about 14 years in business and always did so in Missouri; that in 1960 he was a truck driver; that he went to

work for Pac Aid in February or March 1961; that he had known Hawkins for 10 or 12 years; that at first he called on some customers; that he then received an inside job with the company, handling mailing, shipments and supplies; that Raftis instructed him in his job; that the cost of the machines to the company was orginally $28.50, plus shipping; that later, however, they were obtained from another manufacturer and the price got down to around $13.75; that his commission as a salesman was 25 or 30%; and that when he went to work in the office he was on salary plus a fee for handling machines.

In addition to this testimony from two of the appellants, the scheme to defraud, necessary under § 1341, assumes recognizable outline from the aggregate of the following factors: the use of a widely used product with a nationally known and established trade name; the newspaper approach, in many parts of the country, by way of ads appealing for the little person who was inexperienced in vending machine operations; the emphasis on a fine return from a small investment calculated from a starting point suggested by the prospect himself; the inference of possible tax savings and protection; the calculated protective and exculpatory material in the purchase contract reciting non-cancelability, denying predictions as to profit or exclusiveness of territory, providing for retention of the deposit as liquidated damages in the event of non-acceptance of a c. o. d. shipment, and requiring acceptance by Pac Aid; the request that a prospect provide complete financial information, his being told that the form for this had to be fully and completely filled out, and Pac Aid's consistent failure to check this material, thus revealing that it had no bearing on acceptance or non-acceptance; the salesman's obtaining cash or a check when the initial order was signed, coupled, in the case of a check, with immediate bank certification; the withholding of shipment until full payment was made; the absence of a resale department in Pac Aid, although representations were made that that department would assist customers who desired to sell out; lack of knowledge on the part of the salesmen as to how the machines operated; the continued use of a stated address which was only a telephone answering service, even after Pac Aid's office was moved elsewhere; the facts that the coin chutes in the vending machines were not slug proof and were among the less expensive ones produced by its manufacturer; and the substantial difference between Pac Aid's sale price for the machine and its own cost.

There is much more in the way of specific testimony from many individual victims. Much of this, of course, is disputed by the defense. This testimony relates to contact with one or more of the defendants; with representations made by them concerning anticipated sales, return on investment, exclusive territory, surveys, locations, non-necessity of state licenses, and national vending machine rights for Bayer's aspirin; with payment of sums which, for modest people, were sizable; with invalidity of professed locations because of their non-existence or lack of genuine signatures evidencing the owner's consent; with unresponsiveness to appeals for information or assistance; with poor locations and non-exclusiveness; with generally negligible and disappointing sales; with trouble with the machines; and with difficulties with state authorities.

The factors just listed, the revealing testimony from Hawkins and Martin, and the many other attributes of Pac Aid's operations which we have described above, clearly constitute sufficiently substantial evidence of a scheme or artifice to defraud of the type against which § 1341 is directed, and knowing use of the United States mails for the purpose of executing that scheme, and support the jury's verdict of guilty as to all the appellants.

It is no answer, we feel, to suggest that the product, Bayer's aspirin, was a good product, that all the customer-witnesses who paid their purchase prices in full received their machines, that some sales were effected through the machines, that

some customers realized a fair return on their investments, that some buyers were attracted only because they were out to make easy money fast, and that absence of satisfactory financial return was due to the incapabilities or lack of diligence on the part of the customers. The statutory scheme may exist in the presence of any or all of these factors. There is evidence here of something far more than mere puffing or overselling.

The present case, as the government suggests, bears striking similarity to this court's vending machine case of Reistroffer v. United States, 258 F.2d 379 (8 Cir. 1958), cert. denied 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301. There, too, pp. 382–385, were present an organization with small inventory and little capital, a suggestion of affiliation with a recognized national concern, collection from the customer in advance of delivery, substantial profit on the machines, lack of success on the part of the customers, pretenses and representations, unavailability after the sale, profession that the vendor made its profit on the product and not on the machine, and a persuasive sales pitch aimed at persons unschooled in the activity.[1] Of course, there are differences between the two cases and in some respects the *Reistroffer* facts are more extreme. But the pattern is the same in both. The appellants do not cite *Reistroffer* or attempt to explain or distinguish its precedential authority here. Note also the operations described in Krueger v. United States, 331 F.2d 283, 284–285 (8 Cir. 1964), cert. denied 379 U.S. 879, 85 S.Ct. 149, 13 L.Ed.2d 87.

United States v. Rabinowitz, 327 F.2d 62 (6 Cir. 1964), heavily relied upon by the defense, does not persuade us as contrary authority. There was evidence there that the machines in question were of good quality; that the salesmen received some training; that purchasers were given a lesson prior to purchase; that little difficulty was had with the machines; that there were customers who were pleased with them and who made enough to meet the payments on the machines; and that the prospect saw the machine before buying. In addition, the newspaper advertisement was less misleading than Pac Aid's. The Sixth Circuit itself recently emphasized the integrity of the vendor's program in *Rabinowitz*. United States v. Hopkins, 357 F.2d 14, 19 (6 Cir. 1966). Its comments there are significant and of themselves provide effective contrast with the case before us.[2]

---

1. Judge Woodrough, speaking for this court in *Reistroffer*, p. 384 of 258 F.2d, said:
   "The newspaper advertisement attracted persons, as it was designed to do, who were entirely ignorant and uninformed about the business of selling by vending machine. It conveyed to such persons directly and by implication of the wording that a large, responsible, established, and by necessary implication, experienced, informed and successful company was manufacturing and selling the vending machines; would secure suitable and profitable locations for them; would instruct the purchasers in setting up the machines and servicing them; would cooperate and provide supervision of the enterprise with the purchasers; and having knowledge from successful experience could, and did, assure the purchasers that they would make large profits from the machines and 'should become financially independent in a short time'.

   "When the salesmen met prospects who answered the newspaper advertisement they added the power of the spoken word to the assurances of the printed publication expressed and implied. Their 'pitch', as it was called, was enthusiastic, adapted, and intended to make the prospects believe that if they bought vending machines they would forthwith enter into established successful business associated with men who knew the business and would be furnished advantageous locations for the machines and instruction and supervision in setting them up and using them so that large profits would accrue to the purchasers."

2. "In *Rabinowitz* the defendants were engaged in selling knitting machines to the public. Each prospective customer saw the machine prior to purchase, and each got the machine contracted for. The alleged fraudulent representations concerned statements made to the purchasers re-

2. The motions to quash and to suppress. Prior to trial all seven defendants moved to quash a subpoena duces tecum, to suppress all evidence derived therefrom, and to quash the indictment. The subpoena was one issued to Mildred Birkett for her production before the grand jury in August 1963 of various business records and material claimed to be owned by the respective defendants. Mrs. Birkett operated a telephone answering and secretarial service in Saint Louis. The records had been left with her by Raftis and were picked up, after the service of the subpoena, by postal inspectors at a time when none of the defendants was present. After a hearing the motions were denied by Judge Regan.

Although the government's opposition to the motion to suppress was based, in part at least, upon an intimation of the defendants' abandonment of the records, no argument to this effect is made before us. Consequently, our holding concerning comparable records and their abandonment in Friedman v. United States, supra, pp. 701–706 of 347 F.2d is of no significance here. The defense asserts, however, that Schwimmer v. United States, 232 F.2d 855, 860–862 (8 Cir. 1956), cert. denied 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52, is controlling. There this court did reverse a trial court's denial of a motion to quash a subpoena directed to books and papers en masse.

If, on the facts here and upon the authority of *Schwimmer*, there is any conceivable impropriety in the trial court's denial of the defense motions, that impropriety was not brought to fruition against the defendants. This is so because (a) as the appellants concede by their briefs, the prosecution did not use the subpoenaed material during the trial; (b) Betty L. Green was the only person, named as a subject of any of the 24 counts, whose name had been obtained from the subpoenaed records; (c) Green did not testify and no evidence relating to her purchase was offered; (d) Green's count, the 24th, was one of the five which were dismissed by the government with leave of court and which did not go to the trial jury; (e) as established by voir dire, the prosecution, prior to the issuance of the subpoena, was already in possession of knowledge, by way of correspondence, purchasers' copies of contracts, and prior interviews, of Pac Aid's contact with every witness utilized; (f) of the 148 names listed in the indictment only 53 were new and attributable to the material produced in answer to the subpoena; (g) none of the 53 was a witness at the trial; and (h) the indictment itself, with the 148 names, was not presented to the trial jury but was, instead, read by the court as a part of its charge, without inclusion of those names.

Thus, no prejudice whatsoever to the defendants resulted from the court's denial of the several motions. The defense point evaporates and is drained of legal significance and substance. We have no question of the admission at trial of illegally obtained evidence, as illustrated by cases such as Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), and Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), which the appellants cite.

In any event, consideration by the grand jury of illegally obtained evidence in itself affords no ground, constitutional or otherwise, for the quashing of an indictment which is valid on its

garding the potential performance of the machines and the promise of profits which could be made therefrom. In summarizing that case, the court stated:

"There is every evidence that these defendants had confidence in the machine and program. They continued even into 1958 to send out cards urging their purchasers to knit. They kept their offices open for the purchase of gar-

ments. Mihaly said if they could have gotten garments, he was sure there would have been a profit.

"There was sales talk, yes—there were · exaggerations. But they were made to people who had seen the machines and could presumably know their own capabilities. That both salesmen and purchasers were mistaken as to this does not spell out an intent to deceive."

face and where there is no claim that the grand jury was not a "legally constituted nonbiased" one. Lawn v. United States, 355 U.S. 339, 349–350, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), and cases cited.

3. The verdict form. The trial court gave the jury a separate verdict form for each of the three appellants. Each form contained a series of lines reading, "We find the defendant .............. as charged in Count [One]". The number of lines corresponded with the counts submitted to the jury for the particular defendant. The jury was to fill in the space on each line and did in fact insert the word "guilty" on all lines of the three forms. As we have observed, the indictment itself was not given to the jury.

Raftis' and Martin's argument here is that the submission of the multiple counts on the forms after a three weeks trial "could not but help confuse the jury" when it did not have the indictment "before it to see what count was supported by what evidence".

Hawkins argues that the record does not show that he had any ownership of or control in the operation of the business; that he was no more than a salesman; that Raftis was the proprietor, possessor of control, and manager; that the court's submission to the jury of 18 counts against him (Hawkins) was damaging and prejudicial; that if any counts were legally submissible as to him it was only those relating to sales which he made, as was done with the four acquitted defendants; that he would have been acquitted had the counts been so restricted; and that he was badly hurt "when he was thrown in with defendants Raftis and Martin". He emphasizes that Martin was Pac Aid's office manager and salaried and that his activities tied in closely with the operation of the business, whereas his own income was derived from his sales.

It is suggested by all appellants that the indictment should have been given to the jury with the list of 148 names concealed from their view.

None of this argument persuades us. It is easy after the fact to be critical or to suggest something as better procedure. There is, of course, a little force in the argument for multiple counts and the non-submission of the indictment made the jury's selectivity process more complex.

■ But our measure here is one of prejudice. The trial judge, in what we regard as a fair and comprehensive charge, did read to the jury the pertinent parts of § 1341 and all the indictment through the first count except the 148 names. He then reviewed the substance of each of the remaining unwithdrawn counts. He carefully delineated the jury's duties with respect to each defendant and with respect to each count.

We would underestimate the capacity and intelligence of this jury if we were to conclude, as the appellants argue, that, because the jury was not given the formal indictment, it "could not possibly have determined what allegation was made in any one of the mentioned Counts, nor what evidence it heard applicable to any such Count". After all, the jury did acquit four of the seven defendants. Its conviction of the three appellants as to all submitted counts is obviously attributable to its acceptance of the government's theory that Raftis was the instigator of the scheme and its effectuation and organized Pac Aid, that Martin was the office manager and participator in the scheme, and that Hawkins was the principal salesman in the enterprise and the one who received the largest commissions. The jury appears to have convicted across the board those whom it felt were the principals or had the greater interests in the success of the business and to have acquitted those whose connections were less significant. A result of this kind is not uncommon in mail fraud cases. See Friedman v. United States, supra; Krueger v. United States, supra; Slocum v. United States, supra; Butler v. United States, 317 F.2d 249 (8 Cir. 1963), cert. denied 375 U.S. 836, 838, 84 S.Ct. 67, 11 L.Ed.2d 65.

Hawkins' additional argument that Counts 4, 5 and 6 relate to newspaper ads with which he had nothing to do, and Counts 1, 8, 9, 10, 11, 13, 15, 16, 18, 22, and 23 relate to sales with which he was not connected and as to which other salesmen were acquitted, is not helpful to his cause. If this can be regarded as inconsistency in the verdict, it is not error. See Koolish v. United States, supra, p. 525 of 340 F.2d. Further, Hawkins' sentences were divided into two groups, each comprised of sentences concurrent with others. The counts of which Hawkins complains do not constitute all those of which he was convicted in either group. As a consequence, the familiar rule that, with concurrent sentences, the judgment is to be affirmed if the conviction on any count is proper is applicable here. Lawn v. United States, supra, pp. 359 and 362 of 355 U.S., 78 S.Ct. 311; Atkinson v. United States, 344 F.2d 97, 98–99 (8 Cir. 1965), cert. denied 382 U.S. 867, 86 S. Ct. 141, 15 L.Ed.2d 106.

4. Raftis' Exhibit S. This exhibit was representative of letters which Martin prepared for mailing to a substantial number of persons who had responded to Pac Aid newspaper advertisements. It recited that since the noticed ad was placed Pac Aid had been advised that it was not legal to sell aspirin through automatic dispensers in the prospective customer's state; that "Therefore we are not going to set up aspirin route operators in your state", but that "we have another item which we think may have more potential and be of more benefit for you". The trial court excluded Exhibit S on grounds, among others, of hearsay and timeliness. The defense's theory was that it showed good faith and absence of fraud and rebutted government evidence consisting of other letters and witnesses' responses thereto which tended to support the fraud charges.

Although Exhibit S might just as well have been received for what it was worth, we see no prejudicial error in its exclusion. The record indicates that the exhibit and the other letters all bear 1962 dates well toward the end of the period of the alleged scheme. Their relevancy and materiality were remote at best. Further, the exhibit does not constitute persuasive evidence of good faith. It may show nothing more than a desire not to tangle with state law. It could be only self-serving. With its reference to still "another item", it might even prove harmful for the appellants. In view of the entire record we are convinced that the exclusion or admission of this material would have had no effect on the jury's verdict. In any event, we, as a reviewing court, cannot say that its exclusion is cause for reversal.

5. Hawkins' proferred instruction. Hawkins complains of the trial court's refusal to give the precise position instruction he requested. Of course, a defendant is "entitled to have an instruction given, somewhere in the charge, on his theory of defense" and this may be specific. Apel v. United States, 247 F.2d 277, 282 (8 Cir. 1957); Heerman v. Burke, 266 F.2d 935, 939 (8 Cir. 1959).

The trial court here did give a separate position instruction for each of the seven defendants. We have examined the one given for Hawkins and have compared it with the lengthier one he requested and with the one which has to do with the government's position as to Hawkins, and we have done so in the light of the entire record. The position instruction given as to Hawkins comports with the evidence and Hawkins' theory and with appropriate specificity and completeness. Further detail, so far as fairness and appropriateness are concerned, was neither indicated nor necessary. Any material omitted was available for argument. It is not necessary that a position instruction closely approximate a defendant's closing argument. Hawkins' right to have his position stated was recognized and fulfilled.

We also note, in passing, that the position instructions given for Hawkins and for another defendant, who were both represented by the same trial counsel, were the same except as to dates

and as to Hawkins' alternative name and that, with the same exceptions, the instructions refused were the same for both. Yet the other was acquitted and Hawkins was not. This emphasizes, we suspect, the lack of substance in the instructions point.

Affirmed.