449 F.2d 288
 UNITED STATES of America, Appellee,
v.
Ralph LONG, Appellant.
UNITED STATES of America, Appellee,
v.
Charles RICHMOND, Jr., Appellant.
UNITED STATES of America, Appellee,
v.
Norris Lee SMITH, Appellant.
UNITED STATES of America, Appellee,
v.
Frank James TOCCO, Appellant.
 Nos. 20557-20559.
 No. 20577.
 United States Court of Appeals, Eighth Circuit.
 October 4, 1971.
 As Amended on Denial of Rehearings and Rehearings En Banc October 28, 1971.
 
 COPYRIGHT MATERIAL OMITTED John H. Dowell, St. Louis, Mo., for appellant, Long.
 Bernard Weitzman, St. Louis, Mo., for appellant, Richmond.
 David E. Evans, St. Louis, Mo., for appellant, Smith.
 Irl B. Baris, Leonard J. Frankel, Newmark & Baris, St. Louis, Mo., for appellant, Tocco.
 William C. Martin, Asst. U. S. Atty., St. Louis, Mo., Daniel Bartlett, Jr., U. S. Atty., for appellee.
 Before GIBSON and ROSS, Circuit Judges, and EISELE, District Judge.
 ROSS, Circuit Judge.
 
 
 1
 These are direct criminal appeals from judgments of conviction entered upon jury verdicts in the United States District Court for the Eastern District of Missouri. All four appellants were found guilty of bank robbery, in violation of 18 U.S.C. § 2113(a) and (d), and conspiracy to rob the bank, in violation of 18 U.S.C. § 371. We affirm the judgments of conviction.
 
 
 2
 Willie Neal, an accomplice, who pleaded guilty in a prior separate trial, was the Government's principal witness and testified substantially as follows: All the appellants, and Neal, met at appellant Tocco's place of business at 5:30-6:00 p. m. on May 20, 1970, where Tocco outlined the plan for the holdup of the Jefferson Bank and Trust Company. They all rode in Tocco's station wagon to view the bank. They met again the next day at about 5:30 p. m. at Tocco's place, and drove to the bank. The next morning, May 22, 1970, at approximately 7:45 a. m., Neal met Smith and Tocco behind Tocco's business establishment. Smith and Neal were picked up by Long and Richmond in a stolen car, and the four of them drove to the bank. Tocco met them near the bank in his station wagon. Neal, Smith and Richmond entered the rear door of the bank. Richmond held the guard at gun point while Neal went to the teller's window. At this time, a Brinks guard entered the bank; Smith took his gun and Richmond took his cloth money bag. After leaving the bank, they drove in the stolen car, with Long driving, a few blocks, where they stopped and were picked up by Tocco. They were then dropped off by Tocco, but he kept the money, guns and gloves used in the robbery. At about 10:00 a. m., Neal returned to Tocco's place, and helped him with a delivery. On the way back, they stopped at Tocco's residence and picked up the money in a suitcase. At about 6:00 p. m., Neal met Long, Tocco, Tocco's brother Pete, and Richmond at Tocco's place of business. Tocco said there was $18,000 on the desk and each would receive $3,000. He also stated that there was another $80,000 to $90,000 in checks which he would burn together with the Brinks bag.
 
 
 3
 Each defendant offered testimony as to his presence at other places at the times Neal claimed that they were together.
 
 
 4
 All of the defendants have appealed their convictions with Tocco alleging thirteen separate errors. Two of the other defendants have adopted most of the allegations of Tocco, and in addition, Richmond has alleged three separate errors and Long one. Smith merely adopted ten of the alleged errors assigned by Tocco.
 
 
 5
 This Court has considered each of the assignments of error by each of the defendants, but will comment only upon those which are deemed by the Court to have possible substance. Those points not discussed have been found by the Court to be without merit.
 
 I. SEARCH AND SEIZURE
 
 6
 The first point raised by Tocco relates to the search and seizure of certain items found partially burned in a trash barrel just outside the place of business of Tocco and his partners and where Tocco had an office. The items in question were identified at the trial as (1) the charred remains of a check that was taken from the Brinks guard; (2) metal coin bag seals from the Brinks bag; and (3) ash from money straps of the type used by the bank that was robbed.
 
 
 7
 Prior to trial, Tocco filed a motion to suppress all evidence taken pursuant to the search warrant, and after a hearing thereon the motion was overruled. Objections to the introduction of the evidence based on the alleged illegal search and seizure were made at the trial and overruled.
 
 
 8
 On appeal, Tocco claims that the evidence should have been suppressed because (1) the affidavit for the search warrant did not allege facts sufficient to constitute probable cause for the issuance of the search warrant; (2) the items seized were not particularly described in the search warrant; (3) the place from which the trash barrel and its contents were seized was not the place described in the search warrant; and (4) the search was obviously part of a fishing expedition.
 
 
 9
 The affidavit was made by an FBI agent based upon his investigation of the case and upon information furnished him by an "admitted participant" in the robbery.[1]
 
 
 10
 The question is thus squarely presented to us as to whether statements of an admitted participant made to an FBI agent were sufficient to permit a magistrate to make an independent determination that probable cause existed for the issuance of a search warrant under the fourth amendment.
 
 
 11
 Under Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), information must be set forth in such an affidavit showing some of the underlying circumstances from which the officer concluded that the informant was credible or his information reliable and some of the underlying circumstances from which the informant concluded that some of the items sought were on the premises to be searched. In this case, the credibility and reliability of the informant was adequately established by the disclosure in the affidavit that the informant was an admitted participant in the crime and therefore an eyewitness to most of the acts constituting the crime as described in the affidavit.
 
 
 12
 The most recent expression of the Supreme Court of the United States on this subject is in the case of United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), in which the court held adequate an affidavit based largely on the hearsay evidence of an unidentified informer described as a "prudent person" who had recent "personal knowledge" of whiskey sales made by a suspect and who admitted to the agent that he had purchased whiskey from the suspect himself. This information, coupled with the agent's own knowledge of the defendant's background and reputation, was held to be adequate to satisfy the constitutional requirement of probable cause.
 
 In so holding, the Court stated that
 
 13
 "[t]hese statements were against the informant's penal interest, for he thereby admitted major elements of an offense under the Internal Revenue Code. Section 5205(a) (2), Title 26, United States Code, proscribes the sale, purchase or possession of unstamped liquor.
 
 
 14
 "Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility — sufficient at least to support finding. of probable cause to search. That the informant may be paid or promised a `break' does not eliminate the residual risk and opprobrium of having admitted criminal conduct. Concededly admissions of crime do not always lend credibility to contemporaneous or later accusations of another. But here the informant's admission that over a long period and currently he had been buying illicit liquor on a certain premise, itself and without more, implicated that property and furnished probable cause to search." Id. at 583, 91 S.Ct. at 2082.
 
 
 15
 See also United States ex rel. DiRienzo v. Yeager, 443 F.2d 228 (3d Cir. 1971).
 
 
 16
 The requirement that the affidavit set forth underlying circumstances from which the magistrate could determine that there was probable cause to believe the items sought were on the premises to be searched was met by the allegations that on May 22, 1970, Tocco had in his possession at the premises to be searched, a black suitcase containing a part of the money obtained in the bank robbery; and that he said he would distribute part of the proceeds but keep the rest and make it available to the participants at a later time. Clearly, this established probable cause for the search of those premises for the money and other items obtained in the robbery as designated in the warrant.[2]
 
 
 17
 Tocco claims that an accomplice who had admitted participation in an armed bank robbery could not be classified as a credible person. The simple answer to this is that a federal conviction can properly rest on the uncorroborated testimony of an accomplice if it is not otherwise incredible or insubstantial on its face. See Harris v. Ciccone, 417 F.2d 479, 487 (8th Cir. 1969), cert. denied, 397 U.S. 1078, 90 S.Ct. 1528, 25 L.Ed.2d 813 (1970); Kirschbaum v. United States, 407 F.2d 562, 565 (8th Cir. 1969); Patterson v. United States, 361 F.2d 632, 634 (8th Cir. 1966); Williams v. United States, 328 F.2d 256, 259 (8th Cir.), cert. denied, 377 U.S. 969, 84 S.Ct. 1651, 12 L.Ed.2d 739 (1964), and cases cited therein. Certainly no higher standard should be imposed in passing on the sufficiency of the affidavit filed in seeking a search warrant than is applied to the sufficiency of evidence to support a conviction. The Supreme Court has held that affidavits of probable cause are to be tested by much less rigorous standards than those governing admissibility of evidence at trial. Spinelli v. United States, supra, 393 U.S. at 419, 89 S.Ct. 584; McCray v. Illinois, 386 U.S. 300, 311, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).
 
 
 18
 The contention that the items seized were not particularly described in the search warrant is without merit. The only items seized which were admitted into evidence were the charred remains of a check taken from the Brinks guard, the ash from money straps and the coin bag seals, also taken during the robbery. The description of the items sought in the search was sufficient to cover these items which the evidence shows were actually taken in the robbery.
 
 
 19
 The trash barrel and its contents were seized although they were just oustide the building housing Tocco Bros. Sea Food Co. The warrant described the area to be searched as "the premises commonly known as Tocco Bros. Sea Food Co., 1013-15 North 8th Street, St. Louis, Missouri, being a one-story red brick structure with a white and grey painted front and a white painted rear, the building being on the west side of 8th Street, between Carr St. and Cole St." The location of the barrel was at the northeast corner of the building almost touching the building and about three or four feet west of the sidewalk that passed in front of the building. There was testimony that it belonged to Tocco Bros. Sea Food Co. and there was no building on the adjoining lot. An examination of the exhibit discloses that for all practical purposes this trash can was a part of the "premises" to be searched and there is no merit to Tocco's claim that it was not at the place described in the search warrant. Fine v. United States, 207 F.2d 324 (6th Cir. 1953), cert. denied, 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417 (1954), or in the Government's alternative claim that it was abandoned.
 
 II. PRETRIAL MOTIONS
 
 20
 Prior to trial, Tocco filed motions for transfer of cause, for a bill of particulars, to elect one of the two counts of the indictment and for severance. Richmond and Smith filed similar motions and Long filed a motion for a bill of particulars and other related motions.
 
 
 21
 The motions for transfer of the cause based on excessive, adverse pretrial publicity were overruled. Tocco concedes that none of the jurors acknowledged any exposure to the adverse publicity complained of and the record shows that the trial court took all necessary precautionary steps to keep them from any such publicity during the trial. Under these circumstances, and because there was no showing of "inherently prejudicial publicity which has so saturated the community as to have a probable impact on the prospective jurors," the court did not abuse its discretion in refusing to grant the motion to transfer. See McWilliams v. United States, 394 F.2d 41, 44 (8th Cir. 1968), cert. denied, 393 U.S. 1044, 89 S.Ct. 643, 21 L.Ed.2d 593 (1969), and cases cited therein.
 
 
 22
 The motion for a bill of particulars was an effort by the defendants to establish the exact times of the alleged acts described in the indictment in order to establish alibis for those times. As stated in Hemphill v. United States, 392 F.2d 45, 49 (8th Cir.), cert. denied, 393 U.S. 877, 89 S.Ct. 176, 21 L.Ed.2d 149 (1968), "[a]cquisition of evidentiary detail is not the function of the bill of particulars." Under Rule 7(f) Federal Rules of Criminal Procedure, the granting of a bill of particulars is within the sound discretion of the trial court and its determination will not be disturbed absent a showing of an abuse of that discretion. Cullen v. United States, 408 F.2d 1178 (8th Cir. 1969). No such abuse of discretion has been shown in this case.
 
 
 23
 The motion to require the Government to elect between the robbery count and the conspiracy count was without merit and properly overruled. It is well established that the commission of a subtantive offense and a conspiracy to commit it are separate and distinct crimes. Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 98 L.Ed. 435 (1954).
 
 
 24
 The motion for severance was denied, (on several occasions) by the trial court. We have heretofore held that the existence of the prejudice necessary to warrant severance depends upon the facts of each case; that the granting of severance is within the sound discretion of the trial judge and his ruling will rarely be disturbed on appeal; and that the defendant must show something more than that severance would afford an increased chance to be acquitted. Williams v. United States, 416 F.2d 1064, 1070 (8th Cir. 1969), and cases cited therein. No such abuse of discretion has been shown in this case.
 
 III. ACCESS TO WITNESS NEAL
 
 25
 At the pretrial hearings, the attorney for Tocco noted that Willie Neal had entered a plea of guilty to robbing the bank in question and asked the court for permission to interview him prior to trial to determine whether he had evidence favorable to Tocco. The trial judge stated that he had "no idea whether they are going to use him in the trial or not, and in the event they do, I will see that he is made available to you." He twice made similar assurances later in the hearing.
 
 
 26
 Neal was the principal witness against all of the defendants, but the assurances of the trial judge that he would be made available to the attorney for Tocco and the other defendants were not fulfilled for various reasons. Neal sent word he did not want to talk to the defendants' attorneys unless his own attorney was present. His own attorney was inaccessible at most times, and the Government attorney, after talking to Neal at the direction of the trial judge, advised the judge that Neal did not want to talk to the attorneys without his attorney present.
 
 
 27
 After Neal testified before the jury and while confined in the marshal's office in a cell adjacent to defendants Richmond, Smith and Long, he advised Smith he would change his story to say Smith was not involved. There is a dispute as to whether or not he also so advised the attorney for Smith. However, he was then returned to the court and while he admitted telling Smith he would change his story, he said he did so only to get away from Smith and the other defendants, and that his original testimony was correct. Neal was cross-examined extensively at both of his appearances at the trial, both in and outside the presence of the jury.
 
 
 28
 Witnesses to a crime are not the property of the prosecution or the defense and both sides have an equal right and should have an equal opportunity to interview them. Callahan v. United States, 371 F.2d 658, 660 (9th Cir. 1967); Gregory v. United States, 125 U.S.App.D.C. 140, 369 F.2d 185, 188 (1966).
 
 
 29
 However, it is equally true that a witness is not required by law to talk to either the prosecution or the defense attorneys prior to trial except under subpoena. Here Neal obviously (from his testimony) was afraid and did not want to talk to the attorneys for the four defendants, and especially did not want to talk to them outside the presence of his own lawyer. There is no evidence that his reluctance to talk to the defendants' attorneys resulted from any interference by the Government or its attorneys.
 
 
 30
 We conclude that it would have been better procedure if the trial court had permitted the attorneys for the defense to hear directly from the witness Neal whether he would be willing to talk to the defense attorneys, either alone or in the presence of his attorney. We agree with the trial court that the witness had no obligation to talk to the defense attorneys at all. We further agree that the witness could condition his agreement to talk to the defense attorneys upon the understanding that his attorney would be present during such discussions. However, ultimately and finally, the decision must be that of the witness and not of his attorney.
 
 
 31
 From an examination of the entire record, we are, however, convinced that any error of the trial court here in failing to make Mr. Neal available was harmless error, especially in view of the extensive cross-examination by Neal by the attorneys for the defense, both in the presence and outside the presence of the jury.
 
 IV. RESTRICTIONS ON CROSS-EXAMINATION
 
 32
 Tocco's attorney contends that he was improperly restricted in his cross-examination of Willie Neal by the trial judge in that the judge refused to permit extensive cross-examination on the subjects: (1) why Neal was in jail; (2) whether there were any inducements or favorable treatment offered to Neal in exchange for his testimony; (3) whether favored treatment for a relative was promised to induce his testimony; (4) a state charge then pending against Neal; (5) how long Neal had been in jail; and (6) about difficulties between Neal and defendant Smith. Tocco relies on United States v. Dickens, 417 F.2d 958, 959 (8th Cir. 1969), in which Judge Heaney stated as follows:
 
 
 33
 "Reinhardt was an accomplice by his own admission. If the jury believed his testimony, the appellant's conviction was a certainty. Thus, of necessity, the appellant was forced to attack his veracity and credibility. In such a situation, the necessary scrutiny can only be effected by a searching and wide ranging cross-examination. Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953); District of Columbia v. Clawans, 300 U.S. 617, 57 S.Ct. 660, 81 L.Ed. 843 (1937); Beaudine v. United States, 368 F.2d 417 (5th Cir. 1966); Spaeth v. United States, 232 F.2d 776 (6th Cir. 1956); Sandroff v. United States, 158 F.2d 623 (6th Cir. 1946). The right of a defendant to engage in such cross-examination is an essential requirement for a fair trial. Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968); Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). While the scope and extent of the cross-examination is within the sound discretion of the trial court, Smith v. Illinois, supra; Bass v. United States, 326 F.2d 884 (8th Cir.), cert. denied, 377 U.S. 905, 84 S.Ct. 1164, 12 L.Ed.2d 176 (1964), wide latitude is crucial when the testimony of an accomplice is involved. Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), rev'g 196 F.2d 886 (7th Cir. 1952); Rossi v. United States, 9 F.2d 362 (8th Cir. 1925). Cf. District of Columbia v. Clawans, supra."
 
 
 34
 An examination of the testimony, however, indicates that adequate cross-examination was permitted in each of the important areas complained of. Here, unlike Dickens, where the accomplice admitted that an inducement was offered but was not permitted to testify as to the details thereof, Neal specifically denied that any inducement was offered either to himself or for his relative. Any other restrictions which were imposed by the trial court were either correctly imposed or fall within the definition of "harmless beyond a reasonable doubt," as set forth in Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
 
 
 35
 V. EVIDENCE AS TO CONTENTS OF LETTERS WRITTEN BY WILLIE NEAL
 
 
 36
 Tocco called three witnesses who were not permitted to testify as to the contents of letters written by Neal to Tocco prior to the robbery while Neal was in jail. The letters purported to say that Neal wanted Tocco to get him out of jail and that he could not stand being in jail; however, they were unavailable at trial. Objections that the testimony was hearsay and not the best evidence were sustained.
 
 
 37
 If indeed any error did result from the rulings, it was certainly harmless error since Willie Neal admitted writing the letters (but did not admit saying he couldn't stand jail), and Tocco was permitted to testify as to the contents of the letters without objection.
 
 VI. SUBPOENA FOR DAISY WILSON
 
 38
 This case went to trial on August 10, 1970, after all attorneys had announced ready for trial, and it was concluded on August 19. Late on August 18, the attorney for Tocco advised the trial court that on Saturday, August 15, he had a conference with Daisy Wilson, grandmother of Willie Neal, and that he wanted her as a defense witness; that she had advised him she would be available to testify on Monday, August 17, but that when he tried to serve her on Monday, it was learned she had left for Mississippi on Sunday. He asked the court for a recess in the trial until Mrs. Wilson could be subpoenaed in Mississippi, which the court denied. He further advised the court
 
 
 39
 "that in matters of his nature I try to keep a supply of subpoenas available just in the event a witness may turn up, as this one has. I have been informed on numerous occasions by the Clerk of this District, and as recently as this afternoon my associate was informed by the Clerk of this District that he is not authorized to issue subpoenas signed and sealed unless the names of the witnesses are included in the subpoena. In other words, he is not authorized, and has been directed not to issue subpoenas in blank.
 
 
 40
 "Had I been able to obtain subpoenas in blank prior to the commencement of this trial, I would have had one available to serve on Mrs. Wilson at the time she was in my office. Unfortunately, I didn't have one, so I have no executed subpoena on which to enforce the process."
 
 
 41
 The attorney did not advise the court that he had requested any subpoenas in blank for this case prior to or during this trial, but merely advised the court that they had been refused in the past; there is no other evidence in the record as to whether or not a blank subpoena was requested and refused in this case.
 
 
 42
 Rule 17 of the Federal Rules of Criminal Procedure provides for the issuance of subpoenas "signed and sealed but otherwise in blank to a party requesting it * * *" and if the attorney had made such a request in this case and was refused, the trial court could then have directed the clerk to issue the blank subpoena. But where there is no evidence of such a request in this case, and where the attorney for the defendant, after announcing ready for trial, waited until the next to the last day of the trial to request a delay, it was not an abuse of discretion to deny the request. As stated in United States v. Bolton, 438 F.2d 1219, 1220 (5th Cir. 1971),
 
 
 43
 "[t]he granting of a continuance until an absent witness can be procured is, of course, within the sound discretion of the district court, and it is not error to deny a requested continuance in the absence of a showing of an abuse of that discretion. United States v. Pierce, 5th Cir. 1969, 411 F.2d 678; Barnes v. United States, 5th Cir. 1967, 374 F.2d 126; Samples v. United States, 5th Cir. 1941, 121 F.2d 263." Accord, Powell v. United States, 420 F.2d 799, 801 (9th Cir. 1969); Evalt v. United States, 382 F.2d 424, 427 (9th Cir. 1967). See also Cummings v. United States, 398 F.2d 377, 379 (8th Cir. 1968); Hemphill v. United States, 392 F.2d 45, 49 (8th Cir.), cert. denied, 393 U.S. 877, 89 S.Ct. 176, 21 L.Ed.2d 149 (1968). Cf. Bandy v. United States, 296 F.2d 882 (8th Cir. 1961), cert. denied, 369 U.S. 831, 82 S.Ct. 849, 7 L.Ed.2d 796 (1962).
 
 VII. REFUSED INSTRUCTIONS
 
 44
 Tocco offered proposed instruction 19 which reads as follows:
 
 
 45
 "In a criminal case, a defendant cannot be compelled to take the stand and testify. Whether he testifies or does not testify is a matter of his own choosing. However, when a defendant elects to take the stand and testify, then he is a competent witness and you have no right to disregard his testimony merely because he is accused of a crime. When he does testify, he at once becomes the same as any other witness and his credibility is to be tested by and subjected to the same tests as are legally applied to any other witness. You have no right to disregard his testimony simply because he is a defendant."
 
 
 46
 The trial court refused to give the instruction as it was written or without the last sentence thereof as suggested by counsel for Tocco. Tocco now claims that it was error to fail to give this instruction under Taylor v. United States, 390 F.2d 278, 284-285 (8th Cir.), cert. denied, 393 U.S. 869, 89 S.Ct. 155, 21 L.Ed.2d 137 (1968). In Taylor, the Court approved an instruction similar to the one requested, but much less favorable to the defendant than the one proposed by Tocco.[3]
 
 
 47
 The Court, in approving the instruction in Taylor, made the following observation:
 
 
 48
 "We do not hesitate to observe, however, that the continuing and frequent attack on an instruction of this kind indicates that its use leaves defense counsel with a troubled mind. We suspect that this discomfort would be alleviated if the defendant were included by reference in the court's general instructions as to all witnesses. We would prefer that the defendant not be be singled out. His interest is obvious to the jury. A general reference, such as `including the defendant', should suffice. Or the simple instruction proposed by Mathes & Devitt, Federal Jury Practice and Instructions § 9.12 (1965), namely, `A defendant who wishes to testify, however, is a competent witness; and the defendant's testimony is to be judged in the same way as that of any other witness', might be considered for use and should withstand attack of the kind present here." Id. at 285. (Emphasis added.)
 
 
 49
 In this case, the trial court gave the following instruction concerning credibility of witnesses:
 
 
 50
 "You are the sole judges of the credibility of the witnesses and the weight and value to be given to their testimony as well as all the evidence and facts and circumstances detailed before you and which have been presented in this trial. In weighing and reconciling the testimony, you should look to the demeanor and manner of the witness testifying, his or her willingness or unwillingness to answer; to the lack of interest, or interest, of any witness in the case; to the relationship of the parties; to the means of knowledge, or lack of knowledge of the facts about which such witness testifies; to the opportunity of the witness to know the facts about which he or she purports to testify; to the reasonableness or unreasonableness of the witness's testimony; to its probability or improbability, and whether the witness has made contradictory statements or not, about material matters involved in this case, and thus having carefully considered all the matters, you must fix the weight and value of the testimony of each and every witness and of the evidence as a whole."
 
 
 51
 The instruction given is in conformity to this Court's admonition in Taylor that "[w]e would prefer that the defendant not be singled out," and failure to give the instruction requested by Tocco was not error.
 
 
 52
 Each defendant also complains that its suggested position instruction was not given. The court gave a short and concise statement of the position of each defendant which informed the jury of each defendant's version of the case, and although not as detailed as those requested, they were entirely adequate. As stated in Raftis v. United States, 364 F.2d 948, 956 (8th Cir. 1966), "[i]t is not necessary that a position instruction closely approximate a defendant's closing argument."
 
 VIII. ALLEGED JUROR MISCONDUCT
 
 53
 After the trial, it was learned that one of the jurors, a Mrs. Martin, was the sister-in-law of the aunt of defendant Richmond. Richmond's mother is a sister of Virgil Davis. Mrs. Virgil Davis is a sister of Mr. Martin, the husband of the juror. On one occasion during the trial, the sister of defendant Richmond spoke to Mrs. Martin in the elevator, identified herself, and said she was in the building to see her brother, Charles Richmond, Mrs. Martin did not connect that name with any defendant and testified that until the trial was over, she was unaware that she was indirectly related to Richmond or that she had ever known him.
 
 
 54
 Considering the distant relationship (which was not a blood relationship but one dependent upon two marriages) and considering the fact that the conversation was perfunctory and did not cause the juror to remember Richmond or connect the name with any defendant in the trial, and considering that she was unaware of any relationship or prior contact with the defendant Richmond until after the trial, the court did not err in overruling the motion for new trial based on newly discovered evidence.
 
 IX. ARREST OF LONG
 
 55
 Prior to trial, a hearing was conducted on Long's motion to suppress evidence alleging that his arrest was unlawful and that therefore the items seized in the search of Long's vehicle incident to that arrest should be suppressed. The trial court overruled the motion to suppress.
 
 
 56
 Long was arrested at about 10:10 a. m. on May 28, 1970. He was arrested by Sgt. Nicholas Tumminello who testified that at about 1:30 a. m. on the day of arrest, he personally spoke to a confidential informant after determining that a detective Partin, who assisted in the investigation and surveillance, "had business with him before; he was very reliable;" that he did not know in what other cases the informant had been used; that the informant told him Ralph Long, Willie Neal and Charles Richmond were involved in the Jefferson Bank robbery and Long was supposed to be the driver in the Jefferson Bank robbery; and that Long was supposed to pick up a suitcase containing some money at his mother's house after nine o'clock on that morning.
 
 
 57
 Sgt. Tumminello testified that after the meeting with the informant, he obtained some pictures of Long and the other suspects and conducted a surveillance of Long's mother's home, the back part of which was very close to the back part of Tocco Bros. Sea Food Co. At about 2:30 a. m., Tumminello saw Long in an auto at the rear of Long's mother's home and visited briefly with him. He also saw defendant Richmond "come to the scene there about 3:30" and talk to Long. At about 7:30 a. m., Long left home and went to work making deliveries. At about 9:30 a. m., he returned to his mother's home, went into the house and came out three or four minutes later with an object in his hand which he placed in the truck and then departed. Tumminello continued to keep him under surveillance (with other officers) and then stopped him and made the arrest. A search of the truck he was driving disclosed a plastic container in which there was $681.00 inside a box containing fresh lettuce in the front interior of the truck.
 
 
 58
 In Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949), the Supreme Court discussed some of the general rules relating to probable cause which were quoted by this Court in United States v. Mitchell, 425 F.2d 1353, 1356-1357 (8th Cir. 1970), as follows:
 
 
 59
 "`In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.
 
 
 60
 "`"The substance of all the definitions" of probable cause "is a reasonable ground for belief of guilt." * * Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790.
 
 
 61
 "`* * * Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, non-technical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.' 338 U.S. at 175-176, 69 S.Ct. at 1311-1312 (footnotes omitted)."
 
 
 62
 In Mitchell, this Court compared the facts therein to those of Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), in which the Supreme Court held that probable cause for an arrest existed when information received from an informant, who had previously provided reliable information, was verified in every way prior to the arrest except as to the contents of the bag the suspect was carrying. United States v. Mitchell, supra, 425 F.2d at 1357 n. 3. A similar comparison is possible here.
 
 
 63
 The information that was verified here prior to arrest was as follows: (1) pictures were used to identify Long; (2) his mother's house was found to be in the vicinity and placed under surveillance; (3) Long was observed in the rear of her home at about 2:30 a. m.; (4) at 3:30 a. m. Long was observed in the company of Richmond who had been identified by the informant as one of the other bank robbers; (5) Long left his mother's home at 7:30 a. m. and started on his deliveries; (6) at 9:30 a. m. Long returned to her home, picked up a container and departed.
 
 
 64
 We are persuaded from this comparison of the information provided, and the verification thereof, that the officers verified every material allegation of the informant which could have been verified within a short time and prior to arrest. The appearance of Richmond on the scene at about 3:30 a. m. and Long's return home to pick up a container of money at approximately the predicted time and during his deliveries are of particular significance. We are not impressed by the argument that a plastic bag rather than a suitcase was picked up by Long.
 
 
 65
 As stated by Justice (then Circuit Judge) Blackmun in Mitchell, supra, at 1361,
 
 
 66
 "so long as Draper remains on the books, so long as the Supreme Court majority chooses not to overrule it but to uphold it on its facts, and so long as it continues to be cited by the Supreme Court, see Terry v. Ohio, 392 U.S. 1, 21 n. 18, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it must stand for us as good law for pre-arrest facts which parallel the Draper facts. United States v. Lugo-Baez, 412 F.2d 435, 439 (8 Cir. 1969), cert. denied, 397 U.S. 966, 90 S.Ct. 1000, 25 L.Ed.2d 257; United States v. Malo, 417 F.2d 1242, 1244-1245 (2 Cir. 1969)."
 
 
 67
 This observation is as valid now as it was then. See also United States v. Wahlquist, 438 F.2d 219, 222-223 (8th Cir. 1971).
 
 X. IN-COURT IDENTIFICATION
 
 68
 At the trial, Government witness Lawrence Sabol testified that he was present in the bank when it was robbed and identified defendant Richmond as one of the robbers. Sabol also testified that about a week prior to the trial (while Richmond was in custody) an FBI agent showed him ten to fifteen photographs, including photographs of everyone he "saw at the bank that day." The Government offered to produce the photographs which had been shown to Sabol by the FBI agent, but was not permitted to introduce them after objection was made by counsel for Tocco. The Court denied the motion of counsel for Richmond to strike the in-court identification made on the ground there was no evidence to show the witness' ability to identify Richmond absent having seen the photographs.
 
 
 69
 Richmond relies principally upon United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), Gilbert v. State of California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), and United States v. Zeiler, 427 F.2d 1305 (3d Cir. 1970). The first two of these cases held that when a defendant in custody has been exhibited in a pretrial lineup without assistance of counsel, the Government must establish by clear and convincing evidence that the in-court identification had an independent origin or that error in its admission was harmless. In Zeiler, the Third Circuit extended that rule to photo identifications.
 
 
 70
 The Ninth Circuit, however, in United States v. Williams, 436 F.2d 1166 (9th Cir. 1970), declined to follow Zeiler and held that a defendant in custody was not entitled to have his attorney present when photographs were shown to two eyewitnesses. In so holding, Judge Duniway said:
 
 
 71
 "Williams argues that the pretrial identification procedures used by the government have denied him both his Sixth Amendment right to counsel and his right to due process of law.
 
 
 72
 "On April 1, 1970, a lineup was held in which Williams was viewed by tellers Kelley and Renfro. Williams was represented by counsel at the lineup. Each teller identified Williams as the person in the lineup who most resembled the robber. The two tellers were also shown, on various occasions between the time of Williams' being taken into custody and his trial, a group of photographs one of which was of Williams. Williams was the only person common to the lineup and the group of photographs.
 
 
 73
 * * * * * *
 
 
 74
 "Williams first argues that, on the authority of United States v. Wade, 1967, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 1967, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, he was entitled to have his counsel present when the prosecution, as part of its preparation for trial and after Williams was in custody, showed the photographs to the two eyewitnesses. We have rejected this contention in Allen v. Rhay, supra [431 F.2d 1160] (at p. 1167), thus aligning ourselves with the Second, Fifth, Seventh and Tenth Circuits. See also United States v. Edwards, 9 Cir., 1970, 433 F.2d 357; United States v. Goetluck, 9 Cir., 1970, 433 F.2d 971; United States v. Roustio, 9 Cir., 1970, 435 F.2d 923. The contrary decision of the Third Circuit in United States v. Zeiler, 3 Cir., 1970, 427 F.2d 1305, does not persuade us to change our views." Id. at 1169.
 
 
 75
 We agree with this reasoning and decline to follow Zeiler. However, "[t]hat there is no right to counsel at such pre-trial photographic identification proceedings does not mean that due process cannot be violated at that stage." United States v. Fowler, 439 F.2d 133, 134 (9th Cir. 1971). If the circumstances surrounding the photographic identification proceedings were "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification," Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the in-court identification must be excluded. In Fowler, however, only one photo was used, and in this case Sabol was shown ten to fifteen photos.
 
 
 76
 Upon examination of the testimony on this issue, it cannot be said the photographic session was so "impermissibly suggestive" as to taint the in-court identification, especially since ten to fifteen photos were used. It is, of course, not the soundest investigative procedure to hold a photographic session one week prior to trial, especially after there has been publication of photographs in the newspapers and on television. Regardless, here there are factors, independent of the photographic session, sufficient to uphold the identification. Cf. United States v. Ranciglio, 429 F.2d 228 (8th Cir.), cert. denied, 400 U.S. 959, 91 S.Ct. 358, 27 L.Ed.2d 268 (1970). The witness testified his attention was attracted to Richmond, who entered the bank in front of him, because of the gloves, with red lining which Richmond was wearing in May. He was even able to describe his clothing. In addition, defense counsel had ample opportunity in cross-examination to expose any confusion in identification and failed to do so. United States v. Mason, 440 F.2d 1293 (10th Cir. 1971).
 
 
 77
 For the reasons set forth herein, the judgment of conviction of each of the defendants is affirmed.
 
 
 
 Notes:
 
 
 [1]
 The affidavit is set forth in pertinent part as follows:
 "And the affiant states that this affidavit is based on the following personal knowledge, information and belief: Investigation by affiant at the St. Louis Police Department and at the above named bank shows that said bank on the above date at about 8:10 A.M. was entered by three individuals, all of whom were armed, at which time, in the presence of employees and customers of said bank, they held up the above named teller at pistol point and told the above named Marjorie Pace to place the money in a bag, and by reason of such demand Marjorie Pace placed in said bag out of the bank money in her possession the above amount consisting of U. S. currency of various denominations. Affiant has ascertained that at said time the deposits of said bank were insured by Federal Deposit Insurance Corporation. On June 5, 1970, in the Eastern District of Missouri, a complaint was sworn to and signed by Special Agent George M. Peet, FBI, naming Norris Lee Smith, Ralph Long, Charles Richmond, Jr., and Willie Neal as participants in the above-described offense. Warrants were issued same date by U. S. Commissioner Garnet W. Taylor. Affiant and other FBI Agents have interviewed the above-named individuals. An admitted participant in the armed robbery of the Jefferson Bank and Trust Company on May 22, 1970, furnished the following facts: On Wednesday, May 20, 1970, and Thursday, May 21, 1970, Frank James Tocco, who is well known to the admitted participant, met with the above four men, including the admitted participant at which time Tocco outlined his plan for the above-described robbery. On those dates, Tocco drove a 1969 Chrysler station wagon, colored green with wood or simulated wood panelling on its sides, and took the four men to the area of the bank in furtherance of the robbery plan. On May 22, 1970, Frank James Tocco furnished guns to participants and drove the above-described car as a getaway car which transported the above-named individuals and the fruits and instrumentalities of the crime away from the area where the stolen car used in the robbery was abandoned. Independent investigation by affiant and other FBI agents show that, since the robbery, a 1969 Chrysler station wagon, green with wood or simulated wood panelling, has been seen in the vicinity of Tocco Brothers' Sea Food Company, 1013-15 N. 8th Street, St. Louis, Missouri, where Frank James Tocco is employed, as well as at his residence 1631 Chesley Drive, Dellwood, Missouri. On June 9, 1970, a person known to affiant as Frank James Tocco was observed by affiant to be operating the above-described automobile, bearing 1970 Missouri license # Z9F226.
 "According to the admitted participant, Tocco and all four of the participants in the bank robbery at the Jefferson Bank and Trust met on May 22, 1970, at approximately 5:30 P.M. at Tocco Brothers Sea Food Co., at 1013-15 North 8th Street, St. Louis, Missouri. At that time Tocco displayed a black suit case on a table-type desk in the southeast corner of the Tocco Brothers Sea Food Co., which suit case was open exhibiting a quantity of United States Currency. At that time Tocco addressed the participants and stated to the effect that there was approximately $19,000.00 in currency from the Jefferson Bank and Trust bank robbery committed by the participants that morning. Tocco stated to the effect that he would give the participants a part of their share of the bank robbery proceeds, but that he would keep the rest to prevent the participants from spending money and attracting attention to themselves. Tocco also stated to the participants words to the effect that he would keep the rest of the money from the Jefferson Bank and Trust robbery and that he (Tocco) would make more money from the robbery available to the participants as they each needed it. At 6:00 P.M. the participants left Tocco Brothers Sea Food Company, 1013-15 North 8th Street, St. Louis, Missouri, at which time Frank James Tocco still had the black suitcase on the desk with all of the currency from the Jefferson Bank and Trust bank robbery of May 22, 1970, except for that money he had just given the participants."
 
 
 [2]
 The warrant stated that certain property was being concealed on the premises, "namely United States currency in the amount of approximately $27,710.00, being property taken from the Jefferson Bank and Trust, St. Louis, Missouri, on May 22, 1970; and United States currency in excess of $20,000.00, together with checks and other papers taken from a guard of Brinks, Inc., during the commission of the robbery at the Jefferson Bank and Trust, on May 22, 1970, plus a white canvas bag used to carry the stolen currency, one .38 caliber revolver and three pairs of brown cotton gloves with red lining used by the participants of the bank robbery, which are the fruits of the said robbery and the instrumentalities used to carry out the robbery at the Jefferson Bank and Trust Co., St. Louis, Missouri, on May 22, 1970."
 
 
 [3]
 The instruction in theTaylor case was as follows:
 "When a defendant in a case of this kind takes the stand, which he has a perfect right to do, he is subjected to all the obligations of a witness, and his testimony is to be treated like the testimony of any other witness; that is to say, it will be for you to say, remembering the matter of his testimony, and the manner in which he gave it, his cross-examination, and everything else in the case, whether or not he told the truth. Then, again, it is for you to remember, you have a perfect right to do so, the very grave interest a defendant has in the case. As he places himself as a witness, he stands like any other witness." Id. at 284 n. 5.