**UNITED STATES of America,**
**Appellant,**

v.

**James Dock MITCHELL, Appellee.**

**No. 19798.**

United States Court of Appeals,
Eighth Circuit.

April 14, 1970.

Charles E. French, Asst. U. S. Atty., Kansas City, Mo., for appellant. Calvin K. Hamilton, U. S. Atty., and Anthony P. Nugent, Jr., Asst. U. S. Atty., were with him on the brief.

Maxim N. Bach of the Legal Aid and Defender Society of Greater Kansas City, Kansas City, Mo., for appellee. Willard B. Bunch, Kansas City, Mo., of the same Society was with him on the brief.

Before BLACKMUN, GIBSON and LAY, Circuit Judges.

BLACKMUN, Circuit Judge.

This appeal by the United States, taken under the eighth paragraph [1] of 18 U.S.C. § 3731, presents us with the question of the continuing vitality of Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), in the face of the Supreme Court's later decisions in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

The facts, naturally, are important. They are not in any real dispute.

The defendant James Dock Mitchell on May 14, 1969, was charged in a two-count indictment with violations of 18 U.S.C. § 659 (theft and knowing possession of stolen goods of a value in excess of $100 moving in interstate commerce). The goods described were a carton of 72 shirts taken April 24 from the Time-DC International Truck Lines terminal at Kansas City, Missouri.

Mitchell, by appointed counsel, promptly and before trial, moved to suppress (a) the carton of shirts seized upon the warrantless search of his automobile at the time of his warrantless arrest on April 24 and (b) statements taken from him while in custody. The motion was based upon the asserted absence of probable cause for his arrest.

The district court, pursuant to Rule 41(e), Fed.R.Crim.P., held a pretrial evidentiary hearing. At its conclusion the court sustained the motion to suppress. United States v. Mitchell, 299 F.Supp. 1395 (W.D.Mo.1969). It set the case for trial but provided that if the United States appropriately took an appeal under § 3731, the case would be removed from the trial docket until the appeal was finally determined. 299 F.Supp. at 1403.

At the hearing Mitchell testified that on the morning of April 24 he drove to a Kansas City tavern, known as the Chouteau Inn, and parked his car on the side lot, about three to four feet from the tavern's heavy side door and with the left of the vehicle near the door; that he entered the tavern through that door, met another man inside, and, within a minute or two, emerged from the building by the door and accompanied by the other man; that they went to the automobile and he raised the lid of its trunk to show his companion "some stuff that was in it"; that in the trunk was a cardboard carton about 4 x 3 x 2 feet in size, within which were smaller shirt boxes of the kind one sees in a clothing store; that the smaller boxes contained shirts;[2] that the carton was open and its flaps were loose; that one side was split; that the carton had no identification printing on it except a label, about 3 x 4 inches in size, on the right; that one of the flaps, when it was folded down, covered the label; that "I had no more than got it [the lid] raised * * * and then this officer grabbed me and told me I was under arrest"; that the officer advised him of his constitutional rights; that the other man was not arrested; that the lid of the trunk remained up after the arrest; that he was not yet showing the shirts to the other man at

---

1. As added by § 1301(a) of the Omnibus Crime Control and Safe Streets Act of 1968, Pub.L. 90–351, 82 Stat. 197, 237.

2. Defense counsel conceded, in response to an inquiry by the district judge, that the carton contained the 72 shirts which are the subject of the indictment counts.

the time of the arrest; and that he was not interrogated at the scene.

The prosecution called Lieutenant Julian R. Hulett, night commander of the investigation division of the Kansas City police department. Lieutenant Hulett testified that he was the arresting officer.

Hulett further stated that he worked from 7 p. m. to 3 a. m.; that at 8 a. m. on April 24 he was awakened at home by a call from "my confidential informant"; and that the informant then told him (a) that a man by the name of James Mitchell would be at the Chouteau Inn between eight and about nine or nine-thirty that morning; (b) that he would be driving what the informant thought was a blue 1963 Chrysler; (c) that he usually parked on the north side of the tavern; (d) that Mitchell was an employee of the DC Freight Lines; (e) that he worked the night shift there; (f) that the trunk of the car would contain some men's Western style shirts; (g) that the shirts were stolen from the DC dock; (h) that Mitchell's purpose at the tavern was to sell the shirts; and (i) that Mitchell was between 35 and 40 years of age, was about 5 feet 10 inches tall, and had short cropped, curly hair.

Hulett stated that upon receiving this information he called a police sergeant for assistance; that he went to the Inn; that near the Inn he met three officers; that with Detective Fortner he entered the tavern; that a short time later Mitchell came in; that another man named Funk entered and had a drink with Mitchell; that Mitchell and Funk then left the tavern together through the side door on the north; that "I waited a very short time and then I left by this same door"; that he observed a blue Chrysler backed up to within three or four feet of the tavern with the trunk lid up; that Mitchell was reaching inside the trunk; that "I observed this large box in the trunk, and it had been split open and it contained other boxes * * * and on the top side of this box I observed a shipping label"; that the label was blue and white; that "armed with the informa-

tion that I had from the confidential informant, and from my observations" he identified himself and made the arrest; and that he did not read the label until after the arrest.

On direct examination Hulett also testified as to four occasions, one in 1965, another in 1966, still another about three months prior to the hearing, and one more immediately before Mitchell's arrest, when he had received from this informant reliable information relative to criminal activity.

In response to an inquiry from the court Hulett said that he had not corroborated the tip of April 24 and that his information concerning the theft came solely from the informant. He went on to say that it was on the basis of the description received from the informant and the presence of the 1963 blue Chrysler that he recognized Mitchell that morning; that he saw the smaller boxes in the large carton but not the shirts within them; and that the smaller boxes were the size of ordinary shirt boxes.

On cross-examination Hulett testified that he had not verified any theft of shirts from the DC Freight Lines before he went to the tavern; that he did not verify that Mitchell worked at DC; that the informant did not tell him that he had observed a theft of shirts at DC; and that the informant did not tell him what the source of his information was. In response to inquiries from the court the Lieutenant stated that he did not ask the informant where he had obtained his information; that he made the arrest around 9 a. m.; that he gave no consideration to obtaining an arrest warrant because "I didn't think it was time for this, and * * * this man had been reliable in the past * * *."; and that the informant did not participate in the DC theft.

Such is the testimony.

We note preliminarily that there is no separate or particular problem about the confessional statements taken from Mitchell. The defense concedes that the

requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), were fulfilled. And both sides agree that the statements stand or fall as being, or not being, the "fruit of the poisoned tree", depending entirely on the validity of the arrest. In other words, the statements are a proper consequence of Mitchell's being in custody. The whole case turns on the validity or invalidity of that arrest.

Neither is there any question that the search of Mitchell's automobile was incidental to his arrest and that if the arrest was lawful, the search was valid.

From our reading of the district court's careful and detailed opinion, we gain the impression that it placed great emphasis upon the fact that Hulett's informant was not named or otherwise identified at the hearing. The court used the adjective "unnamed", as applied to Hulett's informer, no less than 17 times in the course of its opinion. We also note the court's stress of what it felt was the absence of independent police investigation and of corroboration of the informant's tip.

The practicalities of the fact situation, irrespective of their importance or unimportance, deserve passing mention. Lieutenant Hulett was awakened at his home by his informant's call at 8 a. m., only five hours after the termination of his previous night's duty. He was told that Mitchell would be at the tavern between 8 and 9:30 a. m. This meant that Mitchell already might be there and already might have departed after the completion of his mission. Hulett had to move quickly and he must have moved quickly to call the sergeant, to dress, and to get to the tavern before Mitchell arrived. This was prompt action on his part and it was action under a pressure of time which scarcely would allow for a call to DC and for personal verification of Mitchell's employment there, the commitment of an interstate theft, and the identification of the stolen goods. What the informant told Hulett may have been hearsay but, as was observed in *Draper*, 358 U.S. at 313, 79 S.Ct. at 333, Hulett "would have been derelict in his duties had he not pursued it." One wonders whether we are to hang Hulett on the horns of his dilemma, that is, have him go to greater lengths independently to verify at the cost of losing his quarry and, as well, the good will of his reliable informant.

For general background we start, of course, with Mr. Justice Rutledge's well-known pronouncements in Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949):

"In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.

" 'The substance of all the definitions' of probable cause 'is a reasonable ground for belief of guilt.' * * * Since Marshall's time, at any rate, it has come to mean more than bare suspicion: Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543, 39 A.L.R. 790.

" * * * Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to

leave law-abiding citizens at the mercy of the officers' whim or caprice." 388 U.S. at 175–176, 69 S.Ct. at 1311–1312 (footnotes omitted).

This takes us factually on to Draper v. United States, supra, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), decided a decade after *Brinegar* by a 6 to 1 vote, with Mr. Justice Douglas in solitary dissent. Mr. Justice Whittaker wrote the majority opinion and was joined by Justices Black, Clark, Harlan, Brennan and Stewart. The Chief Justice (Warren) and Mr. Justice Frankfurter took no part.

It is on *Draper* that the government pins its case for in its brief it asserts, "If *Draper* has any vitality at all, then Mitchell's arrest was based on probable cause."

The *Draper* facts are celebrated. Every lawyer concerned with probable cause knows of the situation there with its reliable informer and his description of the anticipated arrival by train of a designated individual. He knows, too, of the Supreme Court's comment, 358 U.S. at 313, 79 S.Ct. at 333, that when the man observed matched the man described, the arresting officer "had personally verified every facet of the information given him by Hereford [the informer] except whether petitioner had accomplished his mission and had the three ounces of heroin on his person or in his bag." He

knows, finally, that the Supreme Court held that all this amounted to probable cause.

The government in its brief here effectively compares the Draper informer's tip information with the Mitchell informer's tip information by parallel columns of verifiable (and nearly all verified) allegations.[3] At oral argument Mitchell's counsel conceded the accuracy of this description. After careful study of Mr. Justice Whittaker's opinion and the opinions of the lower courts reported as United States v. Draper, 146 F.Supp. 689, 690–691 (D.Colo.1956), and Draper v. United States, 248 F.2d 295, 297 (10 Cir. 1957), we conclude that the facts of that case and the facts of this case are decidedly similar and, indeed, strikingly parallel.

In some respects the Mitchell tip information was stronger than the Draper tip information: The Draper informant had been employed for only about six months; Hulett had worked with his man for almost four years. Draper's presence at the designated place was to be either one morning or the next; Mitchell's presence was to be within a 90-minute period.

And in the present case the prearrest verification is stronger than in *Draper*: Mitchell's observed actions coincided with the predicted acts when he and Funk

3. "DRAPER

1. Suspect would arrive on a train
2. on one of two mornings.

3. Description—light brown complexion
4. Age—27 years.
5. Height—5'8"
6. Weight—160 pounds.
7. Wearing light brown raincoat,
8. grey felt hat,
9. brown slacks,
10. and black shoes.
11. Walks very fast.
12. Would be carrying a tan leather zipper bag.

MITCHELL

1. Suspect would be at the Chouteau Inn
2. between 8:00 A.M. and 9:30 A.M. that day.
3. Description—short-cropped,

4. curly hair.
5. Age—35 to 40 years.
6. Height—about 5'10"
7. Would sell
8. Western-style shirts,
9. and would drive
10. a blue,
11. 1963
12. Chrysler,

13. which he usually parked on the north side of the building,
14. and the shirts would be in the trunk of the car."

went out the side door together to the described automobile parked at the described place and viewed the contents of the car's trunk; Draper's observed actions had not progressed to the point where another person was involved and thus a sale or other transaction of contraband was under implementation.

In still other respects the two cases are amazingly alike: Each named the suspect. Each provided an adequate description of the suspect's physical characteristics; that is, age, height, weight, and complexion or hair. Each informant had a period of tested reliability. Each suspect appeared at the exact place, in the exact manner, and at the exact time designated. Each matched the description announced by the informant.

It is true that Draper's clothing was described in some detail whereas Mitchell's was not. It is also true that Draper's habit of walking fast and his carrying a tan zipper bag were helpful additions. These, however, are counterbalanced by the information in the present case that Mitchell would arrive in an automobile of specified make, year, and color, and that he would park at a certain place and manner at the tavern.

██ The fact that the prearrest acts of Mitchell observed by Hulett that April morning would not by themselves have satisfied the requirements of probable cause is not fatal. This is inherent in *Draper* and was recognized in Jones v. United States, 362 U.S. 257, 269–270, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). See Bailey v. United States, 386 F.2d 1, 3 (5 Cir. 1967), cert. denied, 392 U.S. 946, 88 S.Ct. 2300, 20 L.Ed.2d 1408.

We perceive no real substance in the fact that Draper's informant was named whereas Mitchell's was not. The death of Draper's informant four days after the arrest, 358 U.S. at 310, 79 S.Ct. 329, may well have eliminated any conceivable reason for further concealment of his identity. In the present case no point of the informer's identity was made at the hearing and the question, on cross-examination of Hulett, whether Funk was the informant was withdrawn by counsel.

We are convinced that if there is any remaining vitality in *Draper*, that decision is applicable and controlling here and supports the legality of Mitchell's arrest. It is true that there was no "independent investigation" by Hulett of the information his informer had conveyed to him in the sense that Hulett verified the employment of Mitchell at DC, verified the interstate theft, and verified the identity of the stolen goods. But other aspects of the information were verified by Hulett's "independent investigation" at the tavern. He saw Mitchell arrive. He saw him converse with Funk. He watched the two men go out through the side door. He saw the blue Chrysler automobile parked close to the door. He saw the lifted trunk lid. He saw a split open carton in the trunk. He saw within the carton boxes of the kind which, at a haberdashery store, contain shirts. All this was prearrest observation. All this corroborated the information the informant had conveyed to Hulett. All this at that point amounted to far more than mere suspicion. As we read the Draper facts and decision, the cases are the same. See McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967).

Apparently, what the defense would require here is that Hulett wait just a little longer. Presumably, had one of those shirt boxes been opened and the shirts contained therein come to the view of Mitchell, Funk and Hulett, then there would be enough. We think this expects too much. After all, the inner boxes were in plain sight and the inner boxes were recognized then and there as shirt boxes.[4] And shirts had been described by the informant as the subject matter of the theft.

---

4. Mr. Justice Douglas observed in Henry v. United States, 361 U.S. 98, 104, 80 S.Ct. 168, 172, 4 L.Ed.2d 134 (1959), "The police must have reasonable grounds to believe that the particular package carried by the citizen is contraband. *Its shape and design might at times be adequate*" (emphasis supplied).

We do not agree with the district court when it would distinguish *Draper* on its facts. As we have stated above, we see nothing of significance in the fact that Draper's informant, although deceased, was named. And we do not agree that "the descriptions furnished of the two defendants involved in the two cases were entirely different". 299 F.Supp. at 1400. Their similarities, in our view, overwhelmingly outweigh any differences.

This takes us to *Draper's* posture in the light of the subsequently decided cases.

In contrast to the position taken by the government, the defense in effect sets *Draper* to one side and says that under the decisions in Aguilar v. Texas, supra, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, supra, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the district court's order must be affirmed.

Both *Aguilar* and *Spinelli* concerned constitutional requirements for the issuance of a search warrant.[5] In *Aguilar* the Court, in invalidating the warrant under challenge there, enunciated what has been called its "two pronged test," namely, "underlying circumstances" both as to the information and as to the informant's reliability.[6] Mr. Justice Goldberg, in writing for the five-justice majority, did not cite *Draper* at all. Mr. Justice Harlan separately concurred and did not cite it. Mr. Justice Clark, joined by two others, dissented; he did cite *Draper*. 378 U.S. at 119, 84 S.Ct. 1509.

If *Aguilar* stood alone, post-*Draper*, we would have no hesitancy in holding

that the Mitchell facts are outside the ban of *Aguilar*. Here there is abundant evidence of the "underlying circumstances" from which Lieutenant Hulett concluded that his informant was credible and his information reliable. Hulett's work with him for four years and the naming of four specific instances in which his tips had proved to be accurate stand in contrast to the generalities with which *Aguilar* was concerned. Hulett's prearrest observation of Mitchell at the tavern, as above outlined, affords corroboration of "some of the underlying circumstances" from which the informant concluded that the shirts were where he claimed they were. See Rugendorf v. United States, 376 U.S. 528, 531–533, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Jones v. United States, supra, 362 U.S. at 271, 80 S.Ct. 725; McCreary v. Sigler, 406 F.2d 1264, 1268–1270 (8 Cir. 1969), cert. denied, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773.

We move on to *Spinelli*. We should state initially that this court, and particularly this panel of this court, is acutely aware of *Spinelli* for each of us was in the majority when *Spinelli* was decided at the circuit level. Spinelli v. United States, 382 F.2d 871 (8 Cir. 1967).

We do not as yet understand that the *Spinelli* majority (4 plus 1 against 3) intended to undermine *Draper* on its facts. Certainly, *Spinelli* did not overrule *Draper* in so many words. Instead, Mr. Justice Harlan in writing the opinion for the Court seemed specifically to affirm the integrity of the *Draper* holding.[7] From the Court's opinion, there-

5. The search warrant situation and the warrantless arrest situation are "basically similar". Spinelli v. United States, 393 U.S. at 417, n. 5, 89 S.Ct. 584; McCreary v. Sigler, 406 F.2d 1264, 1269 (8 Cir. 1969), cert. denied, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773.

6. "Although an affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant, Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, the magistrate must be informed of some of the underlying circumstances from which

the informant concluded that the narcotics were where he claimed they were, and some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed * * * was 'credible' or his information 'reliable.'" 378 U.S. at 114, 84 S.Ct. at 1514 (footnote omitted).

7. "The detail provided by the informant in *Draper* * * * provides a suitable benchmark. While Hereford, the Government's informer in that case, did not state the way in which he had obtained his information, he reported that Draper

fore, *Draper* appears to stand clear and shining as a precedent for its facts—the arrival of the defendant at a specified time and at a specified place, his possession of contraband, a detailed description of the defendant, and independent police corroboration by their observation of the man "whose dress corresponded precisely." Then it was said, 393 U.S. at 417, 89 S.Ct. at 590, that, "since the report was of the sort which in common experience may be recognized as having been obtained in a reliable way, it was perfectly clear that probable cause had been established."

Similarly, here we have arrival of the defendant at a specified time and at a specified place, his possession of stolen goods, a detailed description, not of what he would wear or of his walking habit, but of his height, weight, and hair style, of the automobile he would be driving, and of his parking habit.

It is perhaps not the easiest task for a lower court to walk the logical tightrope of *Draper-Aguilar-Spinelli*, but if the *Spinelli* majority's careful differentiation of *Draper* means anything, it seems to us that it means that *Draper* is still vital.

It must be conceded that Mr. Justice White, in his separate comments in *Spinelli*, 393 U.S. at 423, 89 S.Ct. 584, reveals an unsureness about *Draper* in the light of *Aguilar* and *Spinelli*. He observed that an informer's reliability, standing alone, is not enough for good cause. He was "inclined to agree * * * that there are limited special circumstances" in which a reliable informant's report "will in effect verify itself," for "[d]etailed information may sometimes imply that the informant himself has observed the facts." 393 U.S. at 425, 89 S.Ct. at 593–594. But he then goes on to recite his concern about the logical consistency of *Draper*, *Aguilar*, and *Spinelli*.[8]

had gone to Chicago the day before by train and that he would return to Denver by train with three ounces of heroin on one of two specified mornings. Moreover, Hereford went on to describe, with minute particularity, the clothes that Draper would be wearing upon his arrival at the Denver station. A magistrate, when confronted with such detail, could reasonably infer that the informant had gained his information in a reliable way. Such an inference cannot be made in the present case. Here, the only facts supplied were that Spinelli was using two specified telephones and that these phones were being used in gambling operations. This meager report could easily have been obtained from an offhand remark heard at a neighborhood bar.

"Nor do we believe that the patent doubts *Aguilar* raises as to the report's reliability are adequately resolved by a consideration of the allegations detailing the FBI's independent investigative efforts. * * * Once again, *Draper* provides a relevant comparison. Independent police work in that case corroborated much more than one small detail that had been provided by the informant. There, the police, upon meeting the inbound Denver train on the second morning specified by informer Hereford, saw a man whose dress corresponded precisely to Hereford's detailed description. It was

then apparent that the informant had not been fabricating his report out of whole cloth; since the report was of the sort which in common experience may be recognized as having been obtained in a reliable way, it was perfectly clear that probable cause had been established." 393 U.S. at 416–418, 89 S.Ct. at 589–590 (footnote omitted).

8. " * * * But if what *Draper* stands for is that the existence of the tenth and critical fact is made sufficiently probable to justify the issuance of a warrant by verifying nine other facts coming from the same source, I have my doubts about that case.

" * * * The thrust of *Draper* is not that the verified facts have independent significance with respect to proof of the tenth. The argument instead relates to the reliability of the source: because an informant is right about some things, he is more probably right about other facts, usually the critical, unverified facts.

"But the Court's cases have already rejected for Fourth Amendment purposes the notion that the past reliability of an officer is sufficient reason for believing his current assertions. * * *

"The tension between *Draper* and the *Nathanson-Aguilar* line of cases is evident from the course followed by the majority opinion. * * * The *Draper* ap-

Mr. Justice White's distress does not, of course, solve the present case for us, for, as an inferior federal court, we remain confronted with any "tension" which exists between *Draper, Aguilar,* and *Spinelli.* However, so long as *Draper* remains on the books, so long as the Supreme Court majority chooses not to overrule it but to uphold it on its facts, and so long as it continues to be cited by the Supreme Court, see Terry v. Ohio, 392 U.S. 1, 21 n.18, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968), it must stand for us as good law for prearrest facts which parallel the *Draper* facts. United States v. Lugo-Baez, 412 F.2d 435, 439 (8 Cir. 1969), cert. denied, 397 U.S. 966, 90 S.Ct. 1000, 25 L.Ed.2d 257; United States v. Malo, 417 F.2d 1242, 1244–1245 (2 Cir. 1969).

■ Our choice is limited. We are bound to follow *Draper,* and on Mitchell's facts we follow it again here, until the Supreme Court, perhaps upon Mr. Justice White's suggested "full-scale reconsideration," sees fit to overrule it or, opposedly, to reaffirm it, in either case eliminating some of the doubts which may exist. Perhaps Mitchell's case is the vehicle by which reconsideration may be effected.

We add that we do not regard our result as inconsistent with the holdings in cases urged upon us by *Mitchell:* Pigg v. United States, 337 F.2d 302 (8 Cir. 1964) (where, in the words of the Second Circuit, United States ex rel. McCullers v. McMann, 370 F.2d 757, 759 (2 Cir. 1967), "the police were entirely unaware that any crime had been committed"), and Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959) (where the nature of the particular theft

and the manner in which the defendant was implicated "remain unexplained and undefined").

The defense in its brief finally suggests that the eighth paragraph of § 3731 is unconstitutional in that it denies the defendant his sixth amendment right to a speedy trial and also violates his fourteenth amendment guarantee of equal protection.

■ We regard these issues as prematurely raised on this appeal. If and when Mitchell's case proceeds to trial, the issues may be preserved and resolved upon the facts as they then appear. See Bistram v. Minnesota, 330 F.2d 450, 453 (8 Cir. 1964); Henderson v. Circuit Court, 392 F.2d 551, 552 (5 Cir. 1968). It is at that time that the speedy trial issue is to be determined in the light of cases such as United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966); Hodges v. United States, 408 F.2d 543 (8 Cir. 1969); Hodgdon v. United States, 365 F.2d 679 (8 Cir. 1966), cert. denied, 385 U.S. 1029, 87 S.Ct. 759, 17 L.Ed.2d 676; and Burns v. Harris, 340 F.2d 383 (8 Cir. 1965), cert. denied, 382 U.S. 960, 86 S.Ct. 439, 15 L.Ed.2d 363, and that the equal protection issue (or, perhaps more accurately, the due process issue, Simpson v. United States, 342 F.2d 643 n.1 (7 Cir. 1965)) is to be resolved in the light of cases such as United States v. Bitty, 208 U.S. 393, 399–400, 28 S.Ct. 396, 52 L.Ed. 543 (1908), and United States v. Heinze, 218 U.S. 532, 546, 31 S.Ct. 98, 54 L.Ed. 1139 (1910).

The district court's order sustaining the motion to suppress is reversed and the case is remanded.

proach would reasonably justify the issuance of a warrant in this case, particularly since the police had some awareness of Spinelli's past activities. The majority, however, while seemingly embracing *Draper,* confines that case to its own facts. Pending full-scale reconsideration

of that case, on the one hand, or of the *Nathanson-Aguilar* cases on the other, I join the opinion of the Court and the judgment of reversal, especially since a vote to affirm would produce an equally divided Court." 393 U.S. at 426–429, 89 S.Ct. at 594–595.