**UNITED STATES of America, Appellee,**

v.

**James Ray GASKILL, Appellant.**

**No. 73–1628.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 16, 1974.

Decided Feb. 14, 1974.

Rehearing Denied March 4, 1974.

A. L. Shortridge, Joplin, Mo., for appellant.

Anthony P. Nugent, Jr., Asst. U. S. Atty., Kansas City, Mo., for appellee.

---

Before MATTHES, Senior Circuit Judge, HEANEY, Circuit Judge, and SMITH, Senior District Judge.*

MATTHES, Senior Circuit Judge.

A multiple count indictment charged that James Ray Gaskill used the mails for the purpose of executing a fraudulent scheme in violation of 18 U.S.C. § 1341. Specifically, the indictment alleged that beginning on or about August 28, 1968, and continuing to on or about December 23, 1970, defendant devised a scheme to defraud Retail Grocers Association of Kansas City, Missouri, Kraft Foods Company, General Foods Company and other companies that could and would be induced by defendant to redeem cash-off merchandise coupons from him and to make payment on the coupons. The indictment further alleged that defendant knew that the coupons had not been turned in by retail purchasers of merchandise. The jury found defendant guilty on four counts, each involving a separate mailing. After his posttrial motions were denied, defendant was fined $1,000 on each of three counts and placed on one year probation on the fourth count. Defendant has appealed and we affirm.

The basic issue at trial and on appeal is the sufficiency of the evidence to warrant a jury in finding that the defendant had concocted a scheme to defraud within the ambit of § 1341. Defendant submits that there was a complete failure of proof as to any fraudulent scheme. In resolving this question, we are guided by the axiomatic principle which requires us to review the evidence in the light most favorable to the verdict and accept as established all reasonable inferences to support the conviction. United States v. Rauch, 491 F.2d 552 (8th Cir. 1974); United States v. Dugan, 477 F.2d 140 (8th Cir. 1973); United States v. Henson, 456 F.2d 1045 (8th Cir. 1972).

IGA Thriftway South is a supermarket in Joplin, Missouri. Defendant became manager of Thriftway South in 1962 and remained in that capacity until January, 1971, when the store was sold. The focus of the trial was upon defendant's conduct as manager of the supermarket during the period from August, 1968, to September, 1970, insofar as his managerial conduct related to the submission for redemption of an unusually high volume of cash-off coupons to manufacturers of merchandise and to the Retail Grocers Association, a coupon clearinghouse, for redemption.

The cash-off coupon is a discount, designed by the manufacturer of a certain product to encourage consumers to purchase that product by offering it to them at a reduced price. The manufacturer distributes the coupons to the consuming public through various means. The consumer thereby learns that a certain item may be purchased at a reduced price when the appropriate coupon is presented to a retailer at the time of purchase. The value of the coupon varies, there being some evidence indicating that the average value is about ten cents. Upon tender by the customer, the retailer accepts the coupons and either deducts the value thereof from the cost of the price of the article sold, or pays the amount of the coupon to the consumer. The retailer then submits the coupon directly to the manufacturer who initially distributed it, or indirectly to the manufacturer through a clearinghouse, which charges a nominal fee for handling. In either case, the manufacturer eventually repays the retailer the face value of the coupon plus an additional few cents on each coupon to remunerate the retailer for his effort in accepting the coupon from the consumer.

In August, 1968, defendant placed ads in the *Fire Fly Reporter,* described as a "refund bulletin," having nationwide circulation. The ads appeared under the name of Pyramid Hobbies, a title adopt-

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

ed by defendant. Typical of many of the ads which appeared in numerous issues of *Fire Fly Reporter* during the existence of the scheme is the following:

> Will trade two G.B. TV or S&H Green Stamps for each cash-off coupon. Worthy cause. Fast service. Enclose SASE. Pyramid Hobbies, P.O. Box 82 Joplin, Mo. 64801 (9–70).

The advertising campaign proved successful. Defendant received literally thousands of cash-off coupons through Pyramid Hobbies from individuals living in various parts of the United States. The S&H green stamps used by the defendant in the exchange for the coupons were purchased in connection with a used car business defendant operated.

Between September 6, 1968, and September 25, 1970, the Coupon Redemption Account of Retail Grocers Association in Kansas City, with whom defendant on behalf of Thriftway South had entered into a contract to redeem coupons submitted by the store, issued 73 checks to IGA Thriftway South in the total sum of approximately $167,500. There was a wide variance in the amount of the checks. The one issued on April 21, 1969, was for $178.00, whereas the one issued on November 18, 1969, was for $10,891.39. All the checks were issued for the purpose of redeeming the face amounts of the coupons plus a relatively small amount of commission. The checks bore the stamped endorsement of "IGA Thriftway South." Four of the checks, totaling about $14,000, were endorsed by defendant's personal signature.

The foregoing facts were established by uncontradicted evidence. Indeed, they were expressly or impliedly conceded by defendant in his testimony. The only controverted issue, as we see it, is whether the inordinately large volume of coupons were legitimately obtained by Thriftway South from customers who had tendered them upon purchase of merchandise, or whether, as the government contended, the redeemed coupons had been collected by defendant through his mail order campaign and then submitted to manufacturers of the merchandise by misrepresenting that the coupons had been received legitimately in the course of business by Thriftway South.

Defendant unequivocally testified that all the redeemed coupons had been collected from customers of Thriftway South, but telling circumstances were such that the jury was fully justified in declining to credit his testimony. Representatives of several large food corporations testified that Thriftway South was submitting for redemption many times the normal value of coupons tendered to a market having the volume of business comparable to Thriftway South by its customers. During the period from August, 1968, to September, 1970, Thriftway South was submitting coupons at the rate of approximately $6,700 per month, while two other markets in Joplin, Thriftway East and Thriftway West, having sales nearly as large as Thriftway South, were submitting coupons to a clearinghouse at the rate of only about $100 or $400 per month.[1] There is evidence showing that the normal rate of redemption of General Foods Company coupons from a store having a volume of business comparable to Thriftway South would be approximately $900 per year.[2] However, defendant was responsible for submission of General Foods coupons by Thriftway South for redemption valued at over $10,000 in a one year period in 1968 and 1969.

1. Apparently defendant attempted to allay the suspicions of some of the manufacturers by asserting that his store did $6 million in grocery business annually, a figure quadruple the actual sales of the store. Nevertheless, several companies refused to honor all the coupons defendant's market submitted for redemption because defendant as store manager declined to prove that his store's sales of a certain product corresponded to the number of coupons submitted by Thriftway South for that item.

2. The manager of the General Foods Coupon Redemption Center testified without contradiction that an average retailer will submit for redemption $600 in General Foods coupons per $1 million in sales.

Additionally, there was evidence that several coupons submitted for redemption by Thriftway South had been distributed solely in a test market area in the state of California.

Defendant's own testimony relating to the marked increase of coupons submitted shortly after his mail order campaign was initiated strains credulity. On cross-examination, he was asked to account for the sudden increase in coupon redemptions by his store from $1,353 per month prior to the advertising campaign to an average of $7,197 per month after the Pyramid Hobbies ads began to appear in *Fire Fly Reporter*. He responded by stating that "our program [to redeem coupons] was more aggressive. We sold more products and we took in more coupons." Considering the relatively small value of each coupon, it readily becomes apparent that it was highly improbable, if not impossible, for a market of the size of Thriftway South in the area where it was located to legitimately collect coupons each month having a value of over $7,000.

Obviously, the jury discredited defendant's asserted motive for purchasing the large volume of coupons through his Pyramid Hobbies operation for a relatively small amount,[3] which was that he intended to purchase Thriftway South or some other supermarket and was collecting the coupons in order to use them in an effort to induce consumers to purchase merchandise from whatever store he acquired.[4]

Summarizing, there was substantial evidence to prove the elements of an offense under 18 U.S.C. § 1341. The subject scheme was established albeit by resort in part to circumstantial evidence, cf. Isaacs v. United States, 301 F.2d 706 (8th Cir.), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962), and there was direct evidence that the mails were used to further the scheme. Thus we have a fraudulent scheme and the use of the mails, the vital elements of a mail fraud case. See Gold v. United States, 350 F.2d 953 (8th Cir. 1965). Unlike United States v. Maze, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), here the use of the mails was an integral element of the scheme to defraud by supplying the defendant with a source of coupons with which to defraud the food companies issuing the coupons.

■ We reject also the defendant's contention that there was no evidence of intent to defraud. The evidence viewed realistically depicts a clever and ingenious scheme to enable defendant to acquire an exceedingly large volume of coupons for almost nominal consideration and to transmit an excessive number of coupons to manufacturers of merchandise or clearinghouses for redemption with the implied representation that the coupons had been legitimately received in the operation of Thriftway South. It is clear that the misrepresentation as to the source of the coupons induced the manufacturers to honor coupons which they were under no contractual duty to honor and would not have honored if they had known the true origin of many of the coupons submitted by Thriftway South. It is established that from such conduct intent to defraud can be inferred.[5] United States v. Seasholtz, 435 F.2d 4 (10th Cir. 1970).

3. The evidence is undisputed that the total amount paid by defendnt for the S&H green stamps was $5,600.

4. Defendant never did purchase a supermarket, and at the time of trial still had in his possession a large quantity of coupons which he had received through the mails.

5. There was no direct evidence that defendant converted all of the profits of the checks to his own use, but a reasonable inference to be drawn from the evidence is that he did profit from his machinations. He had full and free access to the bank account of Thriftway South. He always had available in his market a very substantial amount of currency. Four of the checks issued to Thriftway South carried defendant's personal endorsement, indicating, according to the testimony of the president of the United Missouri Bank of Joplin, that the proceeds of the checks were paid to defendant.

In any case, proof that the defendant obtained gain from his scheme is not essential

We have considered defendant's contention that the trial court erred in denying his motion to dismiss the indictment and find it without merit. The fact that the grand jury based its indictment, in part at least, on a summary of a postal inspector's report covering his investigation of defendant's activities does not render the indictment vulnerable to a successful attack. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). *See also* 1 C. Wright, Federal Practice & Procedure § 111 (1969).

The judgment is affirmed.

for conviction under the mail fraud statute, Erwin v. United States, 242 F.2d 336 (6th Cir. 1957), nor need there be any evidence that anyone was actually defrauded by the scheme, Pritchard v. United States, 386 F.2d 760 (8th Cir. 1967), cert. denied, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968).