**UNITED STATES of America, Appellee,**

v.

**Elmer CUMMINGS, Appellant. No. 74–1352.**

United States Court of Appeals, Eighth Circuit.

Submitted Sept. 10, 1974.

Decided Nov. 20, 1974.

Rehearing Denied Dec. 18, 1974.

Michael F. Pieplow, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S. D., for appellant.

Larry Von Wald, Asst. U. S. Atty., Sioux Falls, S. D., for appellee.

Before LAY, ROSS and WEBSTER, Circuit Judges.

ROSS, Circuit Judge.

After a trial to the court, Elmer Cummings was convicted of two counts of knowing interstate transportation of gambling devices in violation of 15 U.S.C. § 1172. He appeals, alleging that the trial court erred in not suppressing certain evidence which had been seized pursuant to a search warrant; in finding sufficient evidence to show a knowing violation; in granting a continuance to allow the government to put on certain rebuttal testimony and in not striking this testimony from the record. We affirm the conviction.

Cummings is a Sioux Falls, South Dakota, businessman who operates a concern which leases jukeboxes and various other coin-operated amusement machines. The facts adduced at the trial reveal that in the latter part of January, 1973, Cummings and one Ernest Sonsa, who operates a business similar to Cummings in Hot Springs, South Dakota, consummated a deal with one James Wakefield to purchase some sixty-odd slot machines which Wakefield had stored in a warehouse in Riverton, Wyoming. In preparation for transporting these machines, Cummings, Sonsa and Wakefield dismantled them, removing the handles and reels; Cummings and Sonsa rented two U-Haul trucks; Cummings and Wakefield loaded the first of the two trucks with dismantled slot machines; and Cummings arranged for two brothers he knew in Sioux Falls, James and Marlyn Christensen, to fly to Riverton separately to drive the trucks when they were ready to move. The first of the trucks, from which the slot machines were seized, was driven by James Christensen from Riverton to Sioux Falls.

At the trial Cummings disputed that he had directed or arranged for Christensen to haul the slot machines across the state line. It was his contention that Sonsa was to meet Christensen at a truck stop near Casper, Wyoming, and direct him to Sonsa's warehouse in Manville, Wyoming, where the slot machines were to be unloaded for storage. Sonsa was also to tell Christensen to proceed on to Hot Springs, South Dakota, to pick up two player pianos which Cummings was purchasing from Sonsa and from there drive on to Sioux Falls. In support of his claim that he had no "knowing" intent to ship the slot machines across state lines he pointed to evidence that he and Sonsa had originally attempted to rent the trucks to go to Douglas, Wyoming, but had agreed to rent them to Sioux Falls when the U-Haul agent in Riverton had told them they must have an out-of-state destination. He also relies on evidence that James Christensen was told to stop and wait for a contact in Casper and that Sonsa did have a warehouse in Manville in which the parts taken off the machines were ultimately stored. Additionally, he points out that he willingly approached law enforcement officers after he learned that the machines had been taken to Sioux Falls, that he immediately disclaimed any intent to transport them in interstate commerce and that he has a reputation for truth and veracity in his community.

The government noted various inconsistencies in Cummings' version. Principally, it was stressed that Christensen had never been told what was in the truck, had no way to get into the padlocked cargo area to unload it, had not been told the importance of remaining in Wyoming until the truck was unloaded and had been told to park the truck in a bank parking lot rather than near Cummings' office when he arrived in Sioux Falls. Also, James, the driver of the first truck, was never told by Cummings to stop in Hot Springs on his way to Sioux Falls.

The trial judge, acting as the trier of fact, drew the inference that all this secrecy along with other inconsistencies in Cummings' version demonstrated the requisite intent and found him guilty of the charge.

I.

Cummings' principal argument on appeal is that the evidence derived from the search of the first truck which contained the dismantled slot machines should have been suppressed because the affidavit upon which the magistrate issued the search warrant was insufficient to establish probable cause as a matter of law. The trial judge refused to suppress this evidence after a motion had been made and a suppression hearing held.

It appears that a municipal judge in Sioux Falls issued the search warrant based solely on the allegations contained in the affidavit. Basically, this affidavit related that a reliable, unnamed informant had contacted one of the officers of the South Dakota Department of Criminal Investigation during the morning of February 3, 1973, (the day after Christensen left Riverton) and had told him that slot machines were being carried to the Sioux Falls area. This informant described the truck in detail as an orange and white U-Haul rental truck with Oregon license plates, number T266–954. He also stated the driver was James Christensen, a resident of Sioux Falls. The affidavit went on to state that the affiant, Agent Donald Gromer of the Department of Criminal Investigation, had identified and followed the truck as it traveled toward Sioux Falls on the interstate highway during the morning of February 4, 1973, that it matched the description given by the informant and that James Christensen had been identified as the driver by a Sioux Falls Police Department detective who had joined the surveillance in that city and who knew Chirstensen personally. Further, the affidavit indicated that the truck did, in fact, arrive in Sioux Falls and that the informant had been used by the Department of Criminal Investigation several times previously, his information having "always been found to be reliable and accurate."

■■ There is no doubt but that an affidavit which will support issuance of a warrant "may be based on hearsay information and need not reflect the direct personal observations of the affiant." Aguilar v. Texas, 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723 (1964). And, of course, the magistrate may rely upon information received through an informant. Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). The issue in this case, therefore, is "whether the magistrate was given sufficient basis for crediting the informer's tip," United States v. Marihart, 472 F.2d 809, 812 (8th Cir. 1972) (en banc), cert. denied, —— U.S. ——, 95 S.Ct. 46, 41 L.Ed.2d 51 (1974); for the tip, if true, would clearly have provided probable cause to conduct a search of the truck. *Marihart* is this Court's most recent attempt to deal with the problem of when a magistrate may rely on a hearsay informant's tip, a problem which has received considerable attention from the Supreme Court.[1] Having been decided subsequent to the Supreme Court's latest opinion dealing with this issue, United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), we believe that *Marihart's* interpretation of the principles involved is

---

1. *See* United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971); Whiteley v. Warden, 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); McCray v. Illinois, 386 U.S. 300, 301–305, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967); Beck v. Ohio, 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed. 2d 723 (1964); Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Jones v. United States, 362 U.S. 257, 267–273, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Henry v. United States, 361 U.S. 98, 80 S. Ct. 168, 4 L.Ed.2d 134 (1959).

controlling in the disposition of the instant appeal.

■ In *Aguilar* the Supreme Court laid down a two-pronged standard for testing the credibility of an informant's tip upon which a magistrate is asked to rely: (1) The magistrate must be given some of the underlying circumstances from which the affiant concluded that the informant was credible or that his information was reliable; and (2) he must be given some of the underlying circumstances from which the informant reached the conclusions conveyed in the tip. Aguilar v. Texas, *supra*, 378 U.S. at 114, 84 S.Ct. 1509; United States v. Marihart, *supra*, 472 F.2d at 812.

■ The affidavit herein recited that the informant had been used several times before by the Department of Criminal Investigation and had been found to be reliable and accurate. This sufficiently meets the first prong of the *Aguilar* test. The fact that an informant has previously given accurate information may be a sufficient test of his reliability. McCreary v. Sigler, 406 F. 2d 1264, 1269 (8th Cir.), cert. denied, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969). However, additionally, here, the magistrate had within the affidavit some corroboration of the story told by the informant. The description of the truck, its driver and its destination, all related by the informant, had been corroborated by independent police surveillance. The informant's reliability was, therefore, established. McCreary v. Sigler, *supra*, 406 F.2d at 1269.

■■ The second prong of *Aguilar*, on the other hand, has not been satisfied here because the affidavit revealed nothing as to how the informant reached his conclusion that the truck contained slot machines. This does not, however, end the inquiry. In *Marihart* this Court, after carefully analyzing Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), concluded:

> *Spinelli* thus stands squarely for the proposition that even if the two-pronged test of *Aguilar* is not met,

the information before the magistrate may be sufficient if, as in *Draper* [Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)], it is sufficiently detailed, or sufficiently corroborated, to supply as much trustworthiness as does the *Aguilar* test.

United States v. Marihart, *supra*, 472 F.2d at 813. *See also* United States v. Lopez-Ortiz, 492 F.2d 109, 114 (5th Cir. 1974); United States v. Black, 476 F.2d 267, 269 (5th Cir. 1973); United States v. Gimelstob, 475 F.2d 157, 159–160 (3d Cir.), cert. denied, 414 U.S. 828, 94 S.Ct. 49, 38 L.Ed.2d 62 (1973).

In short, the type of information relied upon in *Draper*, if present, will provide an alternative to strict compliance with both prongs of *Aguilar*.

Particularly pertinent to the instant appeal is the following language from *Spinelli*:

> In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation.

> The detail provided by the informant in Draper v. United States, 358 U.S. 307, [79 S.Ct. 329, 3 L.Ed.2d 327] (1959), provides a suitable benchmark. While Hereford, the Government's informer in that case, did not state the way in which he had obtained his information, he reported that Draper had gone to Chicago the day before by train and that he would return to Denver by train with three ounces of heroin on one of two specified mornings. Moreover, Hereford went on to describe, with minute particularity, the clothes that Draper would be wearing upon his arrival at the Denver station. A magistrate, when confronted with such detail, could reasonably infer that the in-

formant had gained his information in a reliable way.

Spinelli v. United States, *supra*, 393 U.S. at 416–417, 89 S.Ct. at 589. (Footnote omitted.)

Utilizing *Draper* as a "benchmark" we are satisfied that the informant herein did describe the criminal activity in sufficient detail to assure the tip's reliability. He stated that slot machines were being transported and gave an estimated value of this equipment. He described the truck by color and by rental system. He indicated the license number of the truck. And he correctly identified the driver and the destination of the truck. Certainly there is as much detail and particularity here as in *Draper*.[2]

The key question which must be asked by the magistrate is: "Can it fairly be said that the tip, even when certain parts of it have been corroborated by independent sources, is as trustworthy as a tip which would pass *Aguilar's* tests without independent corroboration?" Spinelli v. United States, *supra*, 393 U.S. at 415, 89 S.Ct. at 588. In the instant case we are convinced that the answer must be in the affirmative.

In summary, we think that the specificity and corroboration of the informant's tip were sufficient to support the magistrate's determination that it was true. There was, therefore, probable cause to issue the search warrant, and the trial court properly refused to suppress the evidence.

## II.

Cummings alleges that there was insufficient evidence to support the trial court's conclusion that there had been a knowing transportation of the slot machines in interstate commerce as required by the statute, which provides that "[i]t shall be unlawful *knowingly* to transport any gambling device [from one state to another]." 15 U.S.C. § 1172. (Emphasis supplied.)

■ In determining whether or not there has been such a knowing transportation two questions are relevant: (1) Did the defendant know that he was transporting the devices in interstate commerce? (2) Did he know that the machines transported were gambling devices? United States v. Twelve Miami Digger Slot Machines, 213 F.2d 918, 921 (5th Cir. 1954).

There is no dispute over the answer to the second question——Cummings knew that the slot machines were gambling devices. He does not contend on appeal that dismantling them changed their character for purposes of enforcing the statute.

■ The first question was answered in the affirmative by the trial judge acting as the trier of fact. It is axiomatic that on appeal from the guilty verdict we must view the evidence on this point in the light most favorable to the government and must "accept as established all reasonable inferences to support the conviction." United States v. Gaskill, 491 F.2d 981, 982 (8th Cir. 1974). *See also* Nilva v. United States, 212 F.2d 115, 121 (8th Cir.), cert. denied, 348 U.S. 825, 75 S.Ct. 40, 99 L.Ed. 650 (1954) [application of this principle in a case involving interstate transportation of gambling devices].

■ A careful review of the record has convinced us that, in light of this principle, the trial judge's conclusion that Cummings did know that he was transporting the slot machines in interstate commerce is supported by sufficient evidence. Cummings offered evidence which strongly suggested that the devices were to be unloaded and stored

2. In United States v. Marihart, *supra*, 472 F.2d at 814 n. 6, this Court stated:

As demonstrated in Part III B of this opinion, we do not believe *Draper* is limited to the degree of detail of tips of future activity. The question is the reliability of the method by which the informer ac-

quired his information, not his talents as a prognosticator. Thus a combination of detail and corroboration of past and future incriminating conduct will suffice. In the instant case the affidavit reveals such a "combination."

in Wyoming. But the inferences which can logically be drawn from his actions, particularly his hiring of drivers in Sioux Falls to (according to his version) drive a truck between two points within Wyoming, his secretive manner with these drivers and his directions to James Christensen to drive the truck to a specific parking lot in Sioux Falls without ever warning him not to go into South Dakota without first unloading the truck, just as strongly point to a knowing interstate transportation. Other facts from which the knowledge element can be inferred are: (1) the dismantling of the slot machines, which could have been preparatory to a defense that they were no longer gambling devices; (2) the renting of two U-Haul trucks to go to Sioux Falls when, even if it were true that Cummings desired to have two player pianos picked up in Hot Springs and delivered to Sioux Falls, only one truck would be needed for that purpose; (3) the lack of any means whereby the driver could get into the cargo area of the truck, which would be necessary were he to unload it in Wyoming without Cummings present. It is recognized that the evidence in this case was not all one-sided in favor of the government. However, there clearly was sufficient evidence of intent to support the guilty verdict.

### III.

Cummings urges that the district judge abused his discretion in granting a continuance of seven weeks from September 21, 1973, to November 9, 1973, to allow the government to put on rebuttal testimony after the close of the defendant's case. This continuance was granted over Cummings' strenuous objection. It is asserted that this delay prejudiced Cummings and denied him his sixth amendment right to a speedy trial.

■ In Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d

101 (1972), the Supreme Court recognized that speedy trial cases must be approached on an *ad hoc* basis, but did identify four factors which should be utilized by courts to make a balancing test in each instance: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." (Footnote omitted.)

■ We recognize that a seven week delay during the course of the trial could be considered to be presumptively prejudicial. However, the reason for the original delay—a missing witness—"should serve to justify appropriate delay." Barker v. Wingo, *supra*, 407 U.S. at 531, 92 S.Ct. at 2192.

■ Most importantly, we do not think that Cummings was prejudiced by the delay. Again in *Barker* the Court identified three interests of defendants which the right to speedy trial was designed to protect: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Barker v. Wingo, *supra*, 407 U.S. at 532, 92 S.Ct. at 2193. (Footnote omitted.) Of these, only (ii) has any relevance here. However, there is no indication that Cummings was deprived of employment, subjected to public scorn or otherwise hampered by the delay, which was not an indefinite prolongation of the oppression of being under indictment. *Cf.* Klopfer v. North Carolina, 386 U.S. 213, 221–222, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). Neither is there any indication that the testimony of the rebuttal witness was a serious factor in the trial court's decision.[3]

■ On balance, then, we conclude that the right to speedy trial was not violated here. There was justification for the delay, which was not inordinately lengthy, and there was no substantial prejudice to Cummings. *See,* United

---

3. Judge Nichol stated:
    But I frankly agree with Mr. Doyle [a defense attorney]—I'm not saying I'm going to necessarily strike it, but I just

can't see, really, where Mr. Singer's testimony has been very helpful to the Government, or why we should have had this long delay to bring this testimony in.

States v. Ackerson, 502 F.2d 300 at 302–303 (8th Cir. 1974).

## IV.

■ It is argued that the court erred in refusing to strike the testimony of the rebuttal witness, Louis Singer. This evidence, which involved prior incidents in which Cummings or his company had allegedly bought and transported gambling devices, was originally admitted to show intent and knowledge. Evidence of other crimes is admissible to prove these elements when they are in issue. Sears v. United States, 490 F.2d 150, 152 (8th Cir. 1974); C. McCormick, Law of Evidence § 190 (2d ed. 1972).

However, during the course of the examination of the witness it became clear that this evidence was not clear and convincing and that it had slight probative value. This Court has said that before evidence of other crimes is admitted:

> it must be shown that (1) an issue on which other crime evidence may be received is raised; (2) that the proffered evidence is relevant to that issue; (3) that the evidence is clear and convincing; and (4) that the probative worth outweighs the probable prejudicial impact.

United States v. Clemons, 503 F.2d 486 at 489 (8th Cir. 1974).

■ Nonetheless, we do not believe that the refusal to strike calls for a reversal here. This was a trial to the court, and the judge indicated he was well aware of the weakness of the testimony. This, along with the complete absence of any reference to the testimony in his memorandum opinion, demonstrates that upon review the judge recognized that the testimony was neither clear and convincing nor more probative than prejudicial. No inferences were drawn from it, and the guilty verdict was amply supported by the other evidence in the case.

For the foregoing reasons the judgment of conviction is affirmed.

LAY, Circuit Judge (dissenting).

I respectfully dissent from Part I of the majority opinion which holds that the magistrate had probable cause to issue the search warrant. The legal question of when probable cause to issue a search warrant exists is a recurring one but, in my judgment, the legal principles involved are now crystallized. I believe they establish reasonable tests which are objective in nature and relatively simple in application.

The two-pronged test of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), requires the magistrate to find, on the basis of the showing made, (1) underlying circumstances sufficient to demonstrate the credibility of the informant or the reliability of his information, and (2) the underlying circumstances from which the informant reliably reached the conclusion that criminal activity was involved.

In the present case, the majority agrees that the second part of the Aguilar test "has not been satisfied here because the affidavit revealed nothing as to how the informant reached his conclusion that the truck contained slot machines." Reliance is then placed on this court's opinion in United States v. Marihart, 472 F.2d 809 (8th Cir. 1972) (Lay and Heaney, JJ., dissenting), which indicates that probable cause may still exist if the information before the magistrate "is sufficiently detailed, or sufficiently corroborated, to supply as much trustworthiness as does the Aguilar test." Id. at 813. The court in Marihart relied on United States v. Harris, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971), and Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). However, conclusory statements such as "sufficient detail" or "sufficient corroboration" fail to explain the reasoning behind the result in those cases. Marihart, Harris and Draper held, essentially, that the factual basis for the information contained in an affidavit need not be contained in the affidavit if the information disclosed is such that it could only have been the re-

sult of "firsthand observation and activity" by the informant. *Marihart, supra,* 472 F.2d at 814. *Cf.* McCreary v. Sigler, 406 F.2d 1264, 1268–1269 (8th Cir.), cert. denied, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969).

Thus, in *Harris,* as in Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L. Ed.2d 697 (1969), the affidavit recited

. . . personal and recent *observations* by an unidentified informant of criminal activity factor showing that the information had been gained in a reliable manner, and serving to distinguish both tips from that held insufficient in *Spinelli,* . . . in which the affidavit failed to explain how the informant came by his information. (Emphasis added.)

403 U.S. at 579, 91 S.Ct. at 2080.[1]

In *Marihart* the affidavit stated that the informant's tip had been partially verified by a police officer who observed three men as they unloaded a large pasteboard box, believed to contain the stolen firearms, and placed it in a vacant apartment. The affidavit in *Marihart* described clandestine activity, thus borrowing from *Harris* (the observed criminal activity), and from *Draper* (extensive corroboration of the informant's tip).

In the present case there was no reference to any personal observation of criminal activity. There was nothing in what the affidavit related which indicated firsthand knowledge of criminal activity. *Cf.* McCreary v. Sigler, *supra.* The affidavit merely described a truck and its license number and correctly identified its driver, owner and destination. This fails to indicate in any way firsthand knowledge of criminal activity. This is no different from the agents being told that the defendant in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), lived at a certain apartment address and had unlisted telephone numbers. Verification of the information concerning the truck's destination did no more to complete the affidavit in this case than did the verification of the information concerning Spinelli's readily observable movements in that case. It is true that this fact tended to corroborate the informant's tip, but it hardly reveals minute details from which firsthand knowledge of the criminal activity could be reliably implied. It did not afford the same level or degree of corroboration found in *Draper,* where the Court held that a detailed description of the alleged offender provided reasonable grounds to believe that information concerning criminal activity was based on first hand observation.

In United States v. Mitchell, 425 F.2d 1353 (8th Cir.), cert. denied, 400 U.S. 853, 91 S.Ct. 85, 27 L.Ed.2d 90 (1970), Judge Blackmun observed that *Draper* turns on the same judicial standard set forth in *Aguilar* and *Spinelli.* In commenting on *Draper,* the Supreme Court observed in *Spinelli*:

A magistrate, when confronted with *such detail,* could reasonably infer that the informant had gained his information in a reliable way. . . .

Nor do we believe that the patent doubts *Aguilar* raises as to the *report's reliability* are adequately re-

---

1. In *Jones* the affidavit read:
   [O]n many occasions the source of information has gone to said apartment and purchased narcotic drugs from the above-mentioned persons and that the narcotics were secreated [*sic*] in the above mentioned places. The last time being August 20, 1957.
   362 U.S. at 267–268 n. 2, 80 S.Ct. at 734.
   In *Harris* the affidavit read:
   This person has personal knowledge of and has purchased illicit whiskey from within the residence described, for a period of more than 2 years, and most recently within the past two weeks, has knowledge of a person who purchased illicit whiskey within the past two days from the house, has personal knowledge that the illicit whiskey is consumed by purchasers in the outbuilding known as and utilized as the "dance hall," and has seen Roosevelt Harris go to the other outbuilding, located about 50 yards from the residence, on numerous occasions, to obtain the whiskey for this person and other persons.
   403 U.S. at 575–576, 91 S.Ct. at 2078.

solved by a *consideration* of the allegations detailing *the FBI's independent, investigative efforts* . . . . Once again, *Draper* provides a relevant comparison. *Independent police work in that case corroborated much more than one small detail that had been provided by the informant.* There, the police, upon meeting the inbound Denver train on the second morning specified by informer Hereford, saw a man whose dress corresponded precisely to Hereford's detailed description. It was then apparent that the informant had not been fabricating his report out of whole cloth; *since the report was of the sort which in common experience may be recognized as having been obtained in a reliable way,* it was perfectly clear that probable cause had been established. (Emphasis added.) 393 U.S. at 417–418, 89 S.Ct. at 589.

Information that a person is going to travel from one town to another (especially if he lives in the latter community) is hardly of the sort that common experience, sense or logic finds so unusual or indicative of personal knowledge or observation that the reliability of allegations of criminal activity may be premised upon it.

The exclusionary rule by which illegally seized evidence is not admissible at trial is seldom understood by laymen or law enforcement officials who zealously attempt to rid crime-infested cities of criminals. Emotional attacks are continually made on its efficacy and continuing viability. The Fourth Amendment right, which the exclusionary rule seeks to protect, *i. e.,* the right to enjoy the sanctity and privacy of one's person and home free from unlawful governmental intrusion, is, however, fundamental. It is one of the basic rights separating all of us from a totalitarian state.

It is of fundamental importance, if the rights guaranteed by the Fourth Amendment are to remain inviolate, that law enforcement officials fully comprehend the line of demarcation between a legal and an illegal search. Magistrates, unless they profess to be a mere conduit for issuance of illegal warrants, must be able to easily discern the legal requirements of probable cause. This will never occur as long as we premise lawful searches on quantitative standards which turn only on the subjective analysis of these officials.

If the law governing search and seizure is to have any clarity, the principles governing sufficiency of probable cause must be objectively defined. A valid search cannot turn on conclusory affidavits which contain neither an express nor an implied revelation of the underlying circumstances by which the information is acquired. None was shown here and the evidence should have been suppressed.